IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,718

In the Matter of SHAYLA C. JOHNSTON,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed December 2, 2022. Disbarment.

*Amanda G. Voth*, Deputy Disciplinary Administrator, argued the cause, and *Kathleen J. Selzler Lippert*, Deputy Disciplinary Administrator, *Deborah L. Hughes*, Deputy Disciplinary Administrator, and *Stanton A. Hazlett*, Disciplinary Administrator, were on the formal complaint for the petitioner.

*Shayla C. Johnston*, respondent, argued the cause pro se.

PER CURIAM: This is an original proceeding in discipline filed by the Office of the Disciplinary Administrator against the respondent Shayla C. Johnston, an attorney admitted to the practice of law in Kansas in 2000. After a February 2021 hearing before a panel of the Kansas Board of Discipline of Attorneys, the panel issued a final hearing report on December 15, 2021.

The hearing panel determined that respondent had violated Kansas Rules of Professional Conduct (KRPC) 1.1 (2021 Kan. S. Ct. R. 321) (competence), KRPC 1.2(d) (2021 Kan. S. Ct. R. 323) (scope of representation), KRPC 1.7(a)(2) (2021 Kan. S. Ct. R. 336) (conflict of interest), KRPC 3.1 (2021 Kan. S. Ct. R. 384) (meritorious claims and contentions), KRPC 3.2 (2021 Kan. S. Ct. R. 384) (expediting litigation), KRPC 3.3(a)(1) (2021 Kan. S. Ct. R. 385) (candor to the tribunal), KRPC 3.4(c) and (f) (2021 Kan. S. Ct. R. 389) (fairness to opposing party and counsel), KRPC 3.5(d) (2021 Kan. S. Ct. R. 390) (impartiality and decorum of the tribunal), KRPC 3.6(a) (2021 Kan. S. Ct. R. 391) (trial

1

publicity), KRPC 4.1 (2021 Kan. S. Ct. R. 397) (truthfulness in statements to others), KRPC 4.2 (2021 Kan. S. Ct. R. 398) (communication with a person represented by counsel), KRPC 4.4(a) (2021 Kan. S. Ct. R. 400) (respect for rights of third persons), KRPC 8.2(a) (2021 Kan. S. Ct. R. 425) (judicial and legal officials), and KRPC 8.4(c), (d), and (g) (2021 Kan. S. Ct. R. 427) (professional misconduct).

The panel dismissed the remaining allegations of rule violations against the respondent because the Disciplinary Administrator failed to argue them at the hearing. After the hearing and arguments, the hearing panel made the following findings of fact, conclusions of law, and recommendations:

FACTUAL AND PROCEDURAL BACKGROUND

"*Findings of Fact*

"60.     The hearing panel finds the following facts, by clear and convincing evidence:

"Representation Involving Personal Cases

"61.     In 2011, the respondent sought a divorce from her then-husband, A.G., Sedgwick County District Court case number 11DM3940. The respondent and A.G. had one minor child, K.G. In 2012, the district court awarded the respondent sole residential and legal custody of K.G. because of A.G.'s drug use, failure to participate in court proceedings, and failure to communicate with the respondent about the child.

"62.     In 2013, the respondent filed a child in need of care (CINC) petition in Sedgwick County District Court, case number 13JC326, regarding her child. In that case, the respondent sought to terminate A.G.'s parental rights. A.G. opposed the termination of his parental rights.

2

"63.     On May 14, 2014, the district court denied the respondent's petition to terminate A.G.'s parental rights finding that the respondent failed to prove by clear and convincing evidence that the child was a CINC or that A.G. was unfit and would remain so in the future. The court also stated that the respondent failed to put forth any evidence that terminating A.G.'s rights would be in the child's best interest and noted that 'asking this court to bastardize a child is troubling.'

"64.     The respondent appealed the district court's decision. On May 22, 2015, in an unpublished opinion, the Court of Appeals affirmed the district court's ruling. *In the Interest of K.G.*, Appellate Court case number 112,115. The Supreme Court denied the respondent's petition for review on October 7, 2015.

"65.     While the appeal was pending, A.G. sought to establish parenting time by filing a motion. Later, on August 4, 2015, the respondent and A.G., through counsel Leah Gagne, entered into an agreed parenting plan. The district court approved the parenting plan.

"66.     On May 2, 2016, the respondent sent an email message to Ms. Gagne which contained a message to A.G.:

> 'This is your opportunity . . . to let go and move on with life, your new relationship and children. No attorney can help you if your goals are illegal and formed only to abuse me and your child.

> 'I fear you will end up in jail. And [K.G.] will never get to know you. If you want to talk, please let me know so I can arrange a time.

> 'If Leah Gagne again advises you to reject this offer, I strongly suggest you get a second legal opinion and not pay her for giving you that advice. I type this now fully knowing she will read this, that a judge will read it and likely a disciplinary administrator. If you are indeed psychologically able to make decisions for yourself, here is your chance to prove it. If you need a referral to another lawyer, please tell me and I will find someone to help you.'

3

"67. In that same email message and without having any evidence to support her suggestion, the respondent stated to Ms. Gagne that if A.G. was threatening her that Ms. Gagne should notify someone. The respondent told Ms. Gagne that A.G. is capable of threatening someone's life. Finally, the respondent informed Ms. Gagne that if A.G. was not threatening her, then Ms. Gagne appeared to be 'intentionally non-cooperative with [the respondent's] efforts to resolve this litigation, to pay [her] child's support and cure any indication of [A.G.]'s 'unclean hands.'

"68. Eight days later, Ms. Gagne filed a motion to withdraw as A.G.'s counsel. The court granted the motion. Thereafter, Kristina Retzlaff entered her appearance on behalf of A.G.

"69. On October 27, 2016, Ms. Retzlaff filed a motion to compel reintegration on behalf of her client. In the motion, Ms. Retzlaff alleged that A.G. completed all the specific tasks he was required to complete to begin reintegration with his child as set out in the agreed parenting plan of August 4, 2015. The court scheduled a hearing on the motion for November 14, 2016.

"70. The respondent filed an untimely response to the motion. In the response, the respondent made several allegations against the Sedgwick County bench and bar. For example, the respondent accused Sedgwick County District Court judges of engaging in an intentional pattern of discrimination against her child due to her marital status through 'collusive efforts' with members of the Sedgwick County family law bar. The respondent also alleged that the improper relationship between judges and members of the bar was designed to 'endanger, economically abuse and deprive property to children of unmarried women with the intent to create a continuous and inflated market for under-employed attorneys.' The respondent never provided any evidence to support these allegations.

"71. That same day, in a letter to the Sedgwick County District Attorney, Marc Bennett, the respondent asked for a formal inquiry into her allegations that Sedgwick County District Court judges and members of the family law bar sexually harassed her, defamed her, and threatened her with sanctions. She again asserted that there existed a pattern and practice of unlawful collusion between Sedgwick County District Court judges and the family law bar to endanger, economically abuse, and

4

deprive property to children of unmarried women with the intent to create a continuous and inflated market for under-employed attorneys. The Sedgwick County District Attorney did not respond to her request.

"72.    On December 12, 2016, the district court held a hearing on A.G.'s motion to compel reintegration. Following the hearing, the court ordered supervised visitation for A.G. every six weeks. The court scheduled a review hearing for April 3, 2017, after three scheduled supervised visits.

"73.    The first two supervised visits between A.G. and his son were held as ordered by the district court.

"74.    On March 20, 2017, the respondent wrote to the Sedgwick County Counselor, Eric Yost. In the letter, the respondent alleged that the Sedgwick County District Court was operating to create perpetual income for the local bar and that the system was designed to 'interfere unjustifiably into the privacy rights of intact, single-parent families for the profit of underemployed attorneys.' The respondent included 10 items 'that could be put in place to mitigate the appearance of racketeering and corruption in County domestic cases.' The respondent never provided any evidence of racketeering or corruption in Sedgwick County.

"75.    On March 22, 2017, the respondent sent an email to Ms. Retzlaff regarding the scheduled review hearing in the family law case. In the email message, the respondent stated that she was preparing a motion based on 'constitutional overage.' The respondent stated that 'the County cannot justify further interference into [her] ability to make decisions about [K.G.'s] health, education and welfare and all further actions on [the] 4th floor must be estopped.' The respondent repeated her allegations of collusion and racketeering between Sedgwick County District Court judges and the family law bar. In the email, the respondent also stated:

'. . . Most concerning is that there appears to be no way for children in this class to prevent against use of the courts for the economic gain of presumably unfit

5

parents, including the unjust enrichment of a biological parent via murder of the child and/or custodial parent and Rule 11 violations that lead to the economic deprivation of children.'

The class of children the respondent was referring to was 'children of un-remarried, divorced single mothers in Sedgwick County.'

"76.    As a result of the allegations made by the respondent against the Sedgwick County bench, on March 24, 2017, the administrative judge asked the Kansas Supreme Court to assign a senior judge to the respondent's family law case. Thereafter, the Kansas Supreme Court assigned Senior Judge John Sanders to preside over the respondent's case.

"77.    Unilaterally, the respondent canceled the third scheduled supervised visit between A.G. and his son. Because the respondent denied A.G. the scheduled visit, Ms. Retzlaff filed an amended motion to compel visitation.

"78.    On March 31, 2017, the respondent filed a motion seeking the dismissal of the motion to compel visitation. In the motion, the respondent sought termination of A.G.'s standing as a father.

"79.    At the review hearing on April 3, 2017, the court took up the two competing motions. During that hearing, the respondent further explained her position. 'So it's not a termination of parental rights. It is his termination as—with the standing of being a parent.' The respondent also argued that the district court lacked subject matter jurisdiction over the family law matter. Specifically, the respondent argued:

'MS. JOHNSTON:  This is about a statute of limitations on parental standing. And if I were remarried, we wouldn't be having this conversation because I would have been able to extinguish his ability to come after me for custody. He would have had his child support obligations extinguished if I had found another man to fill the shoes of [A.G.], and this is what is the problem, that law—

'THE COURT:  How on earth are you—are you going to do that?

6

'MS. J0HNSTON: Are you asking—

'THE COURT: How are you—by getting remarried, how are you going [*sic*] extinguish his rights as the natural father without a termination of parental rights?

'MS. JOHNSTON: Well, I agree with you, Judge, the way that it's placed in the law, it's called a termination of parental rights. What I've tried to gain some clarity on and communicate with the Court and the lawyers about and [A.G.] is that this is just his—it's not his right to see the child. That exists outside of the court. That—I can do that with him without going through court. That's not an issue.

'The issue here is whether he can continue to file motions on me over and over again, not be required to appear, and cause me extreme problems in trying to—I can't afford an attorney. I have lost my home. You know, causing me all of these issues in scheduling. Making it difficult for me to work because I'm in court every other month for three years.

'You know, this is not—this is what's going on, and if his parental right—his standing as a parent were terminated, then he would no longer have the right to gain profit through my son's intestate death, and he would not have the ability to sue for custody or to modify other orders in that regard. And that is—I'm sorry if I'm not explaining it well, Judge, but it's a statute of limitations.'

"80.    In summary, the respondent argued that the statute of limitations for A.G. to become an appropriate father had passed and, as a result, his standing as a parent should be terminated, and thus, the court lacked subject matter jurisdiction. The respondent argued that she should be able to work with A.G. outside of court to establish contact between A.G. and K.G. as she saw fit. She argued that if she had remarried, her hypothetical new husband could have petitioned the court for a step-parent adoption. If her son were adopted by her hypothetical new husband, A.G. could not inherit from K.G. should K.G. die without a will. Additionally, A.G. could no longer cause the respondent

7

to respond to motions filed by A.G. in the family law matter. But, because the respondent had not remarried and cannot have A.G.'s rights extinguished through a step-parent adoption, she is being discriminated against as a single unmarried woman.

"81. The respondent also argued that K.G. was harmed by the district court's 'reckless' orders.

"82. During the hearing, the respondent argued that she 'complied fully with all of the court orders in multiple different forums for five or six years.' However, the respondent also admitted that she unilaterally canceled A.G.'s court-ordered supervised visit. 'So I didn't have any choice, if he's not going to communicate with me, but to cancel the visitation until we had a better agreement about whether we're going to go back to actually following the parenting plan that we agreed to or if that is now going to be abandoned like the previous one so we're going to start over.'

"83. The district court denied the respondent's motion and ordered that A.G. and his son have a visit that same day.

"84. During this same time, the respondent was representing one of her family members, C.B. The case involved disputed paternity and child support. Tragically, on May 20, 2017, C.B.'s three-year-old son, E.B., died as a result of child abuse. E.B.'s murder was not discovered for more than three months.

"85. On June 5, 2017, Ms. Retzlaff filed a motion for contempt against the respondent. In an affidavit filed with the motion, A.G. asserted that the respondent refused to comply with the district court's December 12, 2016, order allowing A.G. parenting time. The district court issued an order directing the respondent to appear and show cause why she should not be found in contempt.

"86. On June 14, 2017, the respondent filed a notice of intent to file a motion for sanctions. In the notice, the respondent asserted that A.G. and his counsel filed motions that lacked evidentiary support and were designed to 'economically coerce' the respondent into case management. The respondent also asserted that she filed a complaint alleging racketeering between Sedgwick County District Court judges, case managers,

8

and the trustee's office. She further alleged that the judges, the case managers, and the trustee's office 'target children of un-remarried mothers to deny parental standing termination for the purpose of fraudulently generating revenue.'

"87.     On June 19, 2017, the district court conducted a hearing in the respondent's family law case. The district court ordered that A.G., who lived out of state, be reintegrated with his son. The court ordered that A.G. have three unsupervised visits before the next review hearing, including a visit for July 15, 2017, from 10:00 a.m. to 8:00 p.m. At the respondent's suggestion, the court ordered the parties to exchange the child at a Wichita QuikTrip selected by the parties. The court scheduled the next review hearing for August 16, 2017. The court ordered A.G. to submit to drug testing. The court ordered Ms. Retzlaff to prepare a journal entry reflecting the court's orders. The respondent asked the court if the order was final for purposes of an appeal. The respondent did not file a notice of appeal.

"88.     Ms. Retzlaff drafted an order and provided it to the respondent. The respondent disagreed about the language of the order. The parties were unable to reach an agreement regarding the contents of the order.

"89.     On July 11, 2017, the respondent sent A.G. a message through 'Talking Parents,' an application designed to be used by divorced parents to communicate regarding their children. In the message, the respondent stated:

'I also hope your attorney has advised you about the costs of an appear [*sic*], the costs of defending federal actions at the same time, that you should not expect the unsupervised visitations to occur. She should have encouraged you to come to agreements with me given there is no parenting plan in place now.

'What do you want to do?'

"90.     A.G. forwarded the respondent's message to his attorney. On July 12, 2017, Ms. Retzlaff sent the respondent an email message asking the respondent to confirm that the unsupervised visit scheduled for July 15, 2017, would occur as ordered.

9

While the respondent responded to Ms. Retzlaff's message asking questions, the respondent did not confirm that she would comply with the court-ordered unsupervised visit scheduled for July 15, 2017.

"91.    On July 13, 2017, Ms. Retzlaff wrote to the respondent again. Ms. Retzlaff responded to the respondent's questions and also stated that if the respondent failed to confirm that she would make K.G. available for the visit by 4:00 p.m. that day, Ms. Retzlaff was planning to contact the district court by email. The respondent did not respond to Ms. Retzlaff's email message.

"92.    That same day, A.G. sent the respondent a message through Talking Parents asking at which QuikTrip would she like to exchange K.G. for the visit. A.G. suggested that they meet at the QuikTrip located at 37th and Rock Road in Wichita. The respondent did not respond to A.G.'s message.

"93.    On July 13, 2017, Ms. Retzlaff sent an email message to the district court asking the court to enter an order on the docket sheet about the scheduled visitation. Ms. Retzlaff also offered to discuss the situation by telephone. Ms. Retzlaff copied the respondent on the message. The respondent replied to the message and indicated that the situation was not an emergency warranting the court's attention. The respondent asked the court to 'not interfere further into this issue and trust that [she would] continue to make decisions in the best interest of this child.'

"94.    That evening, Judge Sanders responded. He stated that he would be the arbiter of what is in the child's best interest and asked Ms. Retzlaff to draft a short order setting forth his earlier order regarding the visitation that was to occur that weekend. Judge Sanders asked Ms. Retzlaff to include a provision in the order that any violation of the order would be considered contempt.

"95.    On July 14, 2017, A.G. sent the respondent a message through Talking Parents. A.G. told the respondent that he was about to fly to Kansas for the visit. He asked her if she wanted to propose an alternative place to meet. He asked for a response.

10

The respondent responded, indicating that she was awaiting a recommendation on how to handle the situation, and assured A.G. that she would make K.G. available for visitation the following day.

"96.    On July 14, 2017, Judge Sanders executed the draft order prepared by Ms. Retzlaff. The order stated that A.G. was to have unsupervised parenting time with K.G. on Saturday, July 15, 2017, from 10:00 a.m. to 8:00 p.m. and that the exchanges were to take place at the QuikTrip at 37th and Rock Road. The order also stated that any violation of the order would be considered contempt of court. The judge sent the parties an email message indicating that he entered an order and sent the order to them through the eflex system.

"97.    Later that day, the respondent sent A.G. a message through Talking Parents. In the message, the respondent informed A.G. that she set up supervised visitation for A.G., K.G., and the respondent for the following day. She asked A.G. to let her know if he was 'up for meeting' with them tomorrow. A.G. informed the respondent that he would be at the QuikTrip at 37th and Rock Road as ordered by the court for his unsupervised visit.

"98.    On July 15, 2017, the respondent sent an email message to Judge Sanders:

'I anticipated Your Honor was occupied with matters larger than this case over the last two weeks. My apologies for this late Friday email. But I cannot access the Order and do not know what the threat of contempt means. I assume I will be arrested tomorrow if I do not comply with the orders for unsupervised visitation. It appears then that I must make some written record at this juncture.

'As I have openly discussed in good faith, I have a federal petition drafted in conjunction with the racketeering cause of action. As events escalated in this case (of which Ms. Retzlaff did not disclose in her email to you), I was advised to seek immediate federal injunctive relief this week. . . . After discussions with the doctors, the supervisor at VEP and [K.G.], I arranged for a visitation tomorrow afternoon at VEP between [K.G.] and both [A.G.] and I, if [A.G.] is willing.

11

[A.G.] was worried earlier this week that his trip would not be wasted and that visitation would occur as I finalized these details. I did not realize that I could have just emailed you to get an emergency order in place without giving [A.G.] the due process of a hearing to prevent this dilemma. Now I can only assume I will be arrested tomorrow unless I comply with the unsupervised visitation.

'Still, I do not regret that I postponed the federal injunctive relief petition so as to continue efforts to confer.

'I will have my father, [a Kansas attorney], make arrangements to get the federal relief filed in the event that I am arrested and have him email you the resulting documentation.'

"99.    A.G. arrived at the designated QuikTrip at 9:00 a.m. While waiting for the respondent to bring K.G. for the unsupervised visit, A.G. sent the respondent messages through Talking Parents to notify her that he was waiting for her at QuikTrip. A.G. waited until 10:45 a.m.; the respondent did not bring [K.G.] for the unsupervised visit.

"100.    At the same time, the respondent sent A.G. a series of messages through Talking Parents asking A.G. whether he would be joining K.G. and the respondent for a supervised visit.

"101.    The following day, July 16, 2021, A.G. sent the respondent a message through Talking Parents:

'Per the court order signed by the judge, I was at the QT at 37th and Rock road [*sic*] in Wichita Kansas on Saturday 7/15/2017. I arrived at 9:00 am and waited for you until 10:45 am. The judgment of the court was from 10 am to 8 pm.

'I was at the meeting place and was in communication with you. Any other communication about visitation is in direct conflict with the judges [*sic*] orders. I will follow the court order and not deviate from said orders.

12

'The fact that you didn't show up to the meeting place puts you in direct contempt of court. You have once again disobeyed a direct order from a judge.'

The respondent replied, noting that A.G. failed to pay child support for over a month. 'It looks like we are both in contempt of court. Quite a pair we are!'

"102. On July 18, 2017, the respondent sent A.G. a message through Talking Parents stating that absent a doctor's recommendation to the contrary, she planned to refuse all communication and visitation between A.G. and K.G.

"103. Under the previous order, A.G. was due to have another unsupervised visit with K.G. on July 29, 2017. On July 29, 2017, through his attorney, A.G. filed a notice of denied parenting time. A.G. provided an affidavit along with the notice. A.G. stated that he would not be coming to Wichita for the court-ordered parenting time because the respondent had implied that she would again deny his parenting time.

"104. On August 2, 2017, Ms. Retzlaff filed an amended motion for contempt against the respondent. In the amended motion, Ms. Retzlaff cited the respondent's failure to comply with the court order for unsupervised parenting time. Again, A.G. executed an affidavit detailing the respondent's refusal to comply with the court's order. That same day, the court issued an order, directing the respondent to appear in court on August 14, 2017, to show cause why she should not be adjudged guilty of contempt.

"105. On August 14, 2017, the respondent defended the contempt proceeding by arguing that she had 'provided plenty of notice' during the June 3, 2017, hearing that she planned to appeal the district court's order of unsupervised visitation. Although the respondent indicated that she provided notice of an appeal, she had not filed a notice of appeal. Asserting that she intended to file an appeal or that she intended to appeal a court's order is not equivalent to filing a notice of appeal as required by law. The respondent stated that she did not comply with the court's order because the doctors disagreed with the court's orders. She indicated that she would permit only supervised visitation.

"106.    The respondent stated that she is the sole legal custodian and cannot be ordered by a court to disobey a doctor's recommendation for what is healthy for her child. The respondent argued that it is unconstitutional for the court to order the respondent to allow unsupervised visitation contrary to a doctor's recommendation. The respondent argued that she is the only one constitutionally allowed to make those decisions. Finally, the respondent informed the court that she has 'federal attorneys' who advised her that she cannot be held in contempt under these facts and that she needed to file for federal injunctive relief to prevent the court from interfering with her sole right to determine how to parent her child.

"107.    On August 21, 2017, the respondent filed a motion for reconsideration of the motion to stay proceedings. In the motion, the respondent falsely asserted that A.G.'s legal standing as K.G.'s parent was suspended and that he presently had no standing to litigate proceedings. The respondent argued that because she was awarded sole legal custody, she was 'no longer under the jurisdiction of the State, and her decisions about K.G.'s care, custody and control were only subject to State interference by a showing of [a] compelling need.' The respondent also argued that the court had no right to compel her appearance or to question her regarding her parenting decisions.

"108.    On August 31, 2017, the district court concluded that the respondent openly defied the court's orders and found the respondent in contempt. The court suspended the imposition of a sanction to allow the respondent to purge the contempt by complying with all orders of the court in good faith. The court indicated that it would review compliance at a future date before deciding if the imposition of a sentence, fine, or other penalty was necessary. Additionally, the court suspended A.G.'s visitation because A.G. tested positive for marijuana. Finally, the court scheduled a review hearing in December 2017.

"109.    On September 7, 2017, the respondent sent an email message to Judge Sanders and Ms. Retzlaff. The message provided:

'No response is needed, this is my professional courtesy to you.

14

'Thank you for bringing clarity and some resolution to our unfortunate situation. Please understand in the coming weeks and months that I cannot control the media. My racketeering complaint made March 21, 2017 was on behalf of [E.B.], my cousin. As you know by now, [E.B.]'s remains were found this weekend. Four judges have [E.B.]'s blood on their hands in the 18th Judicial District.

'We have a public crisis.

'I will refuse to comply with your order, Judge. There will be no opportunity for two children to die in my family because of an overzealous judiciary.'

"110.    On November 1, 2017, the respondent moved to Colorado.

"111.    At a December 8, 2017, review hearing, the respondent informed Judge Sanders that if he imposed sanctions as a result of the contempt finding that she would file a cease and desist order with the Office of Judicial Administration (OJA) and the federal court. The respondent explained that Kansas is one of the few jurisdictions that permit cease and desist orders to be filed under seal with OJA. She stated, '[i]t doesn't have to be filed publicly. It can be done as a request for advice on how to handle a situation. It can be done in a noninflammatory way.' When Judge Sanders asked the respondent who would rule on her cease and desist request, the respondent answered that a panel of three judges who sit on the OJA advisory board would rule on her request. Ultimately, the respondent identified the procedure as an interlocutory appeal and that she had previously requested that Judge Sanders join her in an interlocutory appeal.

"112.    On December 15, 2017, the respondent drafted, but did not file, a response to A.G.'s motion to alter or amend, a motion under K.S.A. 60-260 (relief from judgment or order) based on new evidence, and a motion for sanctions. Even though it was not filed, the respondent provided a copy to Judge Sanders and Ms. Retzlaff. The respondent argued that she had new evidence that A.G. utilized the court for an interstate criminal enterprise. The respondent, however, provided no evidence to support the allegation made against A.G. In a footnote, the respondent stated that 'the issue is not ripe in this case due to [the respondent]'s refusal to allow her child to be murdered during unsupervised visitation in July 2017 . . . .'

15

"113.    In the draft, the respondent also described A.G.'s attempts to reestablish a relationship with his son as gaslighting the respondent. 'They are acts of gaslighting, or intentional reframing of observational truth to cause disparagement of character and cast universal doubt on credibility. Gaslighting is used [by] sociopaths to secure and maintain abuses of power.' She also stated that 'should the court once again deny her equal protection of laws to extinguish parental standing, her remedy will not be to submit to high risk and unfounded orders to place [K.G.] in danger. Her remedy will be injunctive relief with the Office of Judicial Administration and in federal court pursuant to 42 USC 1983.'

"114.    On December 27, 2017, the respondent filed a notice of cease and desist in the family law case. In the notice, the respondent alleged that Judge Sanders and Ms. Retzlaff engaged in 'collusion to fraudulently use court jurisdiction to incarcerate both biological parents of [K.G.]' The respondent asserted that the collusion would result in K.G. becoming a CINC, a criminal violation of K.S.A. 21-5603(a). The respondent stated that her only escape would be to get remarried and have her hypothetical new husband adopt K.G. Finally, by finding the respondent in contempt for refusing to comply with a court order, the respondent asserted that Judge Sanders participated 'in acts of intimidation designed to interfere with [the respondent]'s legal efforts to save the life of another client.' As indicated above at ¶ 84, E.B., the child of C.B., died while in the custody of his mother. The respondent further asserted Judge Sanders had used 'court resources and authority to discredit [the respondent] and frame her as a terrorist or treasonous enemy of the state.'

"115.    The respondent couched her filing as a 'good-faith Constitutional challenge to the validity, scope, meaning or application of family law jurisdiction upon a sole, legal custodian with no visitation orders from grandparents nor stepparents and when the other parent is presumably unfit and a nonresident.'

"116.    In the December 27, 2017, notice, the respondent sought:

a. an injunction against further litigation deriving from A.G.'s standing as a parent pending determination of procedural pathways to parental standing termination;

b. relief from all judgments arising out of her personal family law case, including the contempt judgment;

c. a prohibition against further defamatory statements by the court, Ms. Retzlaff, and A.G. that the respondent has engaged in parental alienation, has caused confusion in the proceedings, has contempt for the court, has engaged in terroristic threats, is treasonous, or has engaged in unethical or noncompliant behavior; and

d. an order directing Judge Sanders, the State of Kansas, Ms. Retzlaff, A.G., and other state entities to cease and desist further threats of incarceration, sanctions, fines, and penalties against the respondent.

"117. On December 27, 2017, A.G., through his attorney, filed a response to the respondent's notice. After receiving A.G.'s response, the respondent sent an email to Judge Sanders and Ms. Retzlaff asserting, among other things, that Judge Sanders and Ms. Retzlaff were 'acting like criminals.'

"118. On January 8, 2018, the respondent filed a complaint with the disciplinary administrator against Ms. Retzlaff. The respondent provided a copy of the complaint to Ms. Retzlaff's law partner and the Sedgwick County Sheriff. In the email message to Ms. Retzlaff's law partner and the sheriff, the respondent asserted that Ms. Retzlaff may have committed mail and wire fraud. The respondent linked a report from one of K.G.'s doctors to the email message. The disciplinary administrator did not docket the complaint against Ms. Retzlaff; rather, the disciplinary administrator dismissed the complaint for a lack of merit.

"119. On January 9, 2018, the respondent filed a complaint with the Kansas Commission on Judicial Qualifications against Judge Sanders. The complaint against Judge Sanders was dismissed because 'the complaint contained no facts establishing reasonable cause to support a finding that the judicial code had been violated.'

17

"120.    On February 23, 2018, Judge Sanders issued a memorandum decision and order. The judge concluded that the district court had personal and subject matter jurisdiction and denied the relief sought in her December 27, 2017, notice.

"121.    On May 18, 2018, the district court allowed Ms. Retzlaff to withdraw from her representation of A.G. On May 31, 2018, A.G. informed the respondent and Judge Sanders that he would be representing himself because he had no income.

"122.    On February 5, 2020, the disciplinary administrator notified the respondent that disciplinary complaints had been docketed against her.

"123.    Three days later, the respondent posted the following on a Facebook page associated with her firm, Excellence Legal, LLC:

'. . . When I forged into family law courts in late 2016, I immediately encountered government-sponsored human trafficking . . . anti-trust violations . . . attorney fee price inflation . . . and cartels of corrupt lawyers, public employees, privitized [*sic*] contractors and judges profiting from the enslavement of families. My market interruption was not welcome. "They" soon were threatening to incarcerate me, my ex-husband and other family members, threatening the safety of children to silence me. My cousin [E.B.] was tortured and murdered with the help of Chief Administrative Judge James Fleetwood in Sedgwick County, Kansas during the initial coercive wave.

'That didn't shut us up.

'So they physically threatened me, battered my clients and stalked my family.

. . . .

'I will continue to blow that whistle loud even if they disbar me.'

18

"Representation of B.J.

"124.　On January 24, 2019, the respondent filed a federal civil complaint alleging a pattern of racketeering activity arising out of a civil involuntary commitment action. *B.J. v. Prairie View, Inc.*, United States District Court for the District of Kansas, case number 19CV2041. The defendants included Prairie View, Inc., a psychiatrist treating patients at Prairie View, the medical director of Prairie View, the secretary of the Kansas Department of Aging and Disability Services, and an assistant county attorney. Prairie View, Inc. is a nonprofit corporation providing mental health services in South Central Kansas.

"125.　In the complaint, the respondent alleged that the defendants were a supply chain of individuals and organizations connected by a common goal to create a market for human bondage through the exploitation of the Kansas Care and Treatment of Mentally Ill Persons Act.

"126.　On April 27, 2020, the federal district court dismissed the case finding the respondent's theory of the case to be implausible. The court concluded that the respondent failed to offer any evidence beyond inflammatory conclusory labels. The court concluded that the respondent's theory of an expansive scheme to involuntarily treat patients using fraudulent civil commitment proceedings, all with a common goal of collecting fees for unnecessary professional services, was not plausible or supported by facts.

"Representation of R.T.

"127.　In a 2013 family law case, M.S. and R.T. divorced, Sedgwick County District Court case number 13DM4220. The respondent went to high school with both M.S. and R.T.

"128.　On July 27, 2017, M.S. sent R.T. a letter asking him to provide current financial information for purposes of calculating a child support modification within 30 days.

19

"129.    The following day, R.T. sent a text message response to M.S. and stated that he would not provide his financial information until she provided hers. M.S. sent R.T. her most recent W-2, her 2016 tax return, and several recent paystubs. Even though M.S. provided her financial information, R.T. did not provide M.S. with his financial information.

"130.    R.T. asked the respondent to represent him in the family law case. On August 3, 2017, the respondent entered her limited appearance on behalf of R.T. According to the respondent's entry of appearance, her appearance was limited to '[r]epresentation and review of child support modification and parenting time adjustment in Sedgwick County Case 2013-DM-004220-DS.' (emphasis in original omitted). At the time the respondent entered her appearance, M.S. was represented by Gregory L. Bernhardt.

"131.    Because R.T. did not provide the requested financial information, on August 29, 2017, Mr. Bernhardt filed a motion to compel. Mr. Bernhardt sought costs and expenses against R.T.

"132.    On September 6, 2017, the respondent filed a proposed child support worksheet on behalf of R.T. The respondent calculated an interstate pay differential for her client who was residing in Colorado based on a comparison of the United States Department of Labor's statistics for average weekly wages by county. The respondent used the average weekly wage figures for the differences between Sedgwick County, Kansas, and Denver County, Colorado. However, R.T. did not reside in Denver County, Colorado; he resided in Arapahoe County, Colorado.

"133.    The respondent made discovery requests to M.S. After M.S. provided the discovery, on October 30, 2017, the respondent sent an email to Mr. Bernhardt accusing M.S. of dishonest conduct regarding her wages. The respondent asserted that M.S. misrepresented her wages as full-time wages when she worked fewer than 40 hours per week. The respondent suggested that M.S. pay R.T. $12,000 plus interest for her 'unclean hands' behavior. The respondent stated that if payment was received within 30 days, the respondent would waive her attorney's fees. But, if payment was not received within 30

20

days, M.S. should 'expect [the respondent's attorney] fees to be requested at the hourly rate of $500 per hour, [her] customary fee for representation, in matters involving compliance and ethics issues.'

"134.    Mr. Bernhardt responded that they could address her 'unfounded allegations and ludicrous demands in court.' He pointed out that R.T.'s discovery responses were due October 29, 2017, and the respondent should consider the email her golden rule notice. Mr. Bernhardt gave the respondent until November 10, 2017, to provide discovery responses.

"135.    On November 5, 2017, the respondent sent Mr. Bernhardt an email stating that because M.S. was working only 28 hours a week on average, the respondent would impute income to 40 hours per week for purposes of trial. The following day, Mr. Bernhardt replied. He explained that M.S. works 30 to 35 hours per week and her employer's schedule dictates her schedule. Mr. Bernhardt pointed out that M.S.'s work schedule has remained the same as it was when she was married to R.T.

"136.    In the respondent's next email to Mr. Bernhardt, the respondent threatened to void her offer to settle the case if Mr. Bernhardt further disparaged her efforts to work out the case. The respondent referred to Mr. Bernhardt's statement that her allegations were ludicrous as unprofessional behavior. Without any legal authority, the respondent asserted that Mr. Bernhardt, the trustee's office, and the court previously owed R.T. a greater duty of care to explain the issues in the case with candor because R.T. had been unrepresented.

"137.    In a draft pretrial conference order, the respondent questioned whether M.S. and Mr. Bernhardt engaged in dishonest conduct because the child support paid by M.S. was based on her employment which was not full-time.

"138.    The respondent failed to provide Mr. Bernhardt with the requested discovery. As a result, on December 8, 2017, Mr. Bernhardt filed a motion to compel discovery.

21

"139.    On January 15, 2018, the respondent filed a notice of intent to request sanctions. In the notice, the respondent alleged that Mr. Bernhardt filed frivolous pleadings and engaged in other litigation abuse. On February 12, 2018, the district court heard the respondent's notice. During the hearing, the respondent referenced her allegation that Mr. Bernhardt filed frivolous pleadings and engaged in other litigation abuse by stating, 'I sincerely hope we don't have to go there' and 'I don't feel the need to professionally disparage Counsel in front of our clients.' The respondent provided no evidence that Mr. Bernhardt filed any frivolous pleadings or engaged in any other litigation abuse despite her allegations.

"140.    In the notice, the respondent alleged overpayment of child support from preceding years and demanded a payment or an offset of $12,000. At the hearing, the respondent abandoned the overpayment issue and presented no credible evidence of unjust enrichment. The court concluded that there was no basis for the respondent's claim of unjust enrichment because M.S. had the same pay rate since 2012. The court stated that '[t]here was zero evidence to support unjust enrichment, concealment of income, or underemployment.'

"141.    The court concluded that the respondent 'litigated the health insurance premium figure to include on the worksheet without being aware of twenty year old [*sic*] case law, or setting forth a colorable basis for not following case law, or making a legitimate argument for a change in the law.'

"142.    The court noted that the respondent pursued a 'metropolitan comparison,' which was not supported by the guidelines or case law. In making the inappropriate comparison, the respondent also used the wrong county in Colorado for comparison. The court concluded that the respondent 'misrepresented her client's income to the court on September 19, 2017.' The court found that the respondent 'pursued an unclear imputed income position in a situation where there was no demonstration of any substantial change in mother's employment, which employment predated the parties' 1997 marriage.' The respondent failed to explain or proffer 'why mother's employment of 36 hours, five days per week with the same employer for 25 years with the same pay rate since 2012 should result in anything other than her actual income being included on the child support worksheet.'

22

"143.    The court described the respondent's approach as an 'unjustified scorched earth approach' and ordered that R.T. pay M.S.'s reasonable attorney's fees, 'primarily because of the conduct of [R.T.]'s counsel, and secondarily because [R.T.] failed to provide the requested income verification.'

"144.    The court noted that in connection to her representation of R.T., the respondent might have had contact with a represented party. The court directed the respondent to self-report her conduct to the disciplinary administrator within 10 days.

"145.    Following the hearing, the district court entered a memorandum order. In the order, the court struck the respondent's notice of intent to request sanctions because the respondent failed to comply with the statutory requirement to register with the Sedgwick County law library. *See* K.S.A § 20-3126.

"146.    On February 14, 2018, the respondent forwarded a copy of Judge Rundle's memorandum order to the disciplinary administrator. However, in her letter to the disciplinary administrator, the respondent denied that her conduct violated the Kansas Rules of Professional Conduct. Rather, the respondent contended 'that Judge Rundle's allegations of misconduct [were] not only unfounded but [were] so clearly contrary to the record that they have the appearance of retaliatory harassment and collusion to conceal potential misconduct of a member of the domestic court bar.'

"147.    In the court's February 12, 2018, memorandum order, the court directed Mr. Bernhardt to prepare all necessary journal entries and orders. Because the parties could not reach an agreement regarding the journal entry, on March 15, 2018, Mr. Bernhardt filed a motion to settle the order. The motion was set for hearing on March 26, 2018.

"148.    Before the hearing on the motion to settle the order, the respondent filed a motion for a change of judge. In the motion, the respondent alleged that Judge Rundle could not afford R.T. a fair hearing of pending issues, including the settlement of the order. In the motion, the respondent reminded the court of its obligation under K.S.A. 20-311e to refrain from retaliating against the respondent for filing the motion.

23

"149.    On March 26, 2018, the respondent filed a second notice of intent to request sanctions against Mr. Bernhardt. In the notice, the respondent asserted that Mr. Bernhardt willfully intended to injure R.T. by misrepresenting and concealing material evidence and that he intended to derive personal profit by creating an unnecessary delay. The respondent also alleged that Mr. Bernhardt failed to disclose certain information, which would have likely decreased R.T.'s child support obligation. Even though it was a notice rather than a motion, the respondent requested relief. The respondent requested that the February 12, 2018, memorandum order be vacated, M.S.'s motions be struck, and the orders entered on July 13, 2017, be restored.

"150.    The hearing on the motion to settle the journal entry was continued pending the resolution of the respondent's motion to disqualify Judge Rundle.

"151.    On March 26, 2018, Judge Rundle denied the respondent's motion to change the judge.

"152.    Thereafter, on March 29, 2018, the respondent filed an affidavit for a change of judge under K.S.A. 20-311d. In the affidavit, the respondent asserted that because she accused Sedgwick County judges and attorneys of racketeering and because Judge Sanders found the respondent in contempt, that Judge Rundle 'irrationally injured an innocent third party as a continued act of retaliation against [the respondent].' Additionally, the respondent alleged that Judge Rundle intended to cause her commercial and personal disparagement.

"153.    The respondent also asserted that Chief Judge James Fleetwood left her a voicemail message and threatened to file an ethics complaint against the respondent for engaging in ex parte communications with a judge. In Chief Judge Fleetwood's voicemail message, he acknowledged the respondent's phone message and informed the respondent that while the judges could not have ex parte communications with one side, the respondent was welcome to file a motion and provide notice to opposing counsel. Chief Judge Fleetwood did not threaten to file a disciplinary complaint against the respondent.

24

"154.    On April 13, 2018, Chief Judge Fleetwood denied the respondent's motion to change the judge. In the journal entry, Chief Judge Fleetwood concluded that the respondent's dissatisfaction with prior rulings did not equate to bias by Judge Rundle. Chief Judge Fleetwood also concluded that the respondent attempted to connect Judge Rundle 'to events not material, relevant or connected to Judge Rundle or the case at hand.'

"155.    On April 18, 2018, the respondent filed a notice requesting that R.T.'s case be reassigned to Judge Michael Hoelscher.

"156.    On May 7, 2018, the district court held a hearing on Mr. Bernhardt's motion to settle the journal entry. Judge Rundle granted the motion and approved Mr. Bernhardt's proposed order and child support worksheet and granted Mr. Bernhardt's request for attorney's fees in the amount of $4,440 against R.T.

"157.    On June 8, 2018, the respondent filed a motion to alter or amend the judgment and a motion for a new trial. In the dual motion, the respondent asserted that Chief Judge Fleetwood refused to comply with the laws of the state of Kansas by denying her motion to recuse Judge Rundle and that Judge Rundle erred in awarding attorney's fees to Mr. Bernhardt without 'any factual nor legal findings to support such an award.' The respondent asserted that these rulings supported her 'prior complaints of [a] RICO conspiracy between Sedgwick County judges and the attorneys who vote for them.' As factual support for her motion, the respondent identified three documents that she drafted and previously filed—a notice of cease and desist filed against Judge Rundle, Chief Judge Fleetwood, the court trustee, and Mr. Bernhardt; a motion to recuse Judge Rundle; and a motion for sanctions filed against M.S. and Mr. Bernhardt. She requested that an out-of-county judge hear her motion 'in order to preserve [R.T.]'s Constitutional procedural and substantive due process rights.'

"158.    On June 27, 2018, Judge Rundle denied the respondent's motion to alter or amend the judgment and motion for a new trial without a hearing.

"159.    On July 23, 2018, the respondent filed a notice of appeal. In the notice, the respondent included the following, '[i]n addition, [R.T.] advises this court of pending

post judgment motions and/or Federal court petition(s) that may result in amendment of this Notice.' The respondent had not filed a federal court petition on behalf of R.T. at that time.

"160. After the respondent filed the notice of appeal, Mr. Bernhardt withdrew and Michael Whalen entered his appearance as counsel for M.S.

"161. On August 30, 2018, the respondent docketed the appeal with the Court of Appeals, case number 119,915.

"162. On September 21, 2018, Mr. Whelan filed a motion for a finding of contempt against R.T. for failing to pay the court-ordered attorney's fees of $4,440. The motion was scheduled for hearing before Judge Rundle on October 2, 2018.

"163. On September 27, 2018, the respondent sent an email message to the disciplinary investigator assigned to investigate DA13156 and DA13172. In the message, the respondent stated that on September 14, 2018, she reported to the Federal Bureau of Investigation that the disciplinary complaints were evidence of collusive criminal misconduct by Sedgwick County officials to suppress Chief Judge Fleetwood's involvement in E.B.'s murder. She also stated that there were over 20 documented acts of collusive witness intimidation in these matters. The respondent asserted that she intended to file judicial complaints against Chief Judge Fleetwood, Judge Rundle, Judge Kevin Smith, and Judge Sanders for threatening her with physical harm by her arrest and confinement in the Sedgwick County jail because the individuals accused of killing E.B. were also incarcerated in the Sedgwick County jail.

"164. On September 27, 2018, the respondent filed a judicial complaint against Judge Rundle. Even though the complaint was filed against only Judge Rundle, in the cover letter, the respondent accused Chief Judge Fleetwood, Judge Smith, Judge Sanders, and Judge Rundle of collusion to have her disbarred or physically harmed. The respondent's claim that the judges colluded to have her physically harmed was based on the premise that the judges would incarcerate the respondent for contempt and that she would be jailed with the individuals charged in E.B.'s murder.

26

"165.    On September 28, 2018, the respondent filed a second complaint against Judge Rundle with the Commission on Judicial Conduct. In a letter accompanying the second complaint, relying on the same assertions, the respondent alleged that Judge Rundle failed to act impartially.

"166.    On November 9, 2018, the Commission on Judicial Qualifications sent the respondent two letters and notified the respondent that the complaints she filed against Judge Rundle were dismissed as they 'contained no facts establishing reasonable cause to support a finding that the judicial code had been violated.'

"167.    On October 1, 2018, the respondent filed two motions in the Court of Appeals. She filed a motion for leave of court to apply for a supersedeas bond and a motion for reassignment of a district court judge to hear a motion for supersedeas bond and other post-trial matters. In the motions, she informed the court that after she filed the notice of appeal, she made criminal complaints against Judge Rundle and Chief Judge Fleetwood with the Wichita Police Department and the Federal Bureau of Investigation. The Court of Appeals denied both motions on October 4, 2018.

"168.    Also, on October 1, 2018, the respondent filed two documents in the district court. She filed what purported to be a response to M.S.'s motion for contempt. However, in the response, she renewed her request that Judge Rundle be disqualified and she requested that the case be permanently assigned to a judge outside of Sedgwick County. She asserted that Mr. Whalen violated K.S.A. 20-311e by filing a motion for contempt based on R.T.'s failure to pay the attorney fee sanction. The respondent also filed a motion for sanctions against Mr. Whalen. The respondent asserted that M.S. willfully intended to injure R.T. by misrepresenting and concealing wages. The respondent also argued that M.S. engaged in unnecessary and wasteful litigation by filing a motion for contempt that was prohibited under K.S.A. 20-311e. In the motion, the respondent attempted to schedule it for hearing the next day, on October 2, 2018.

"169.    In the respondent's motion, she referenced the complaints she filed against judges. However, the respondent did not provide a copy of the complaints with the motions. On October 1, 2018, Mr. Whalen requested that the respondent provide him with a copy of the referenced documents. That night, the respondent replied, informing

Mr. Whalen that the complaints were sealed, that the complaints contained information pertaining to homicide investigations and CINC cases, and that she would not be appearing in Judge Rundle's courtroom.

"170.     The respondent also sent an email to Judge Jeff Dewey, Judge Rundle's administrative assistant, and Mr. Whalen. In the email, the respondent asserted that Judge Rundle previously made threats against her, that Sedgwick County judges threatened to put her in jail with her cousin's murderers, that the threats to put the respondent in jail were threats of physical harm and witness intimidation, and Judge Rundle should not be assigned any of her cases. She indicated that Judge Rundle, Chief Judge Fleetwood, and Judge Sanders were the subject of criminal complaints she filed with the Wichita Police Department and the Federal Bureau of Investigation. Finally, the respondent stated that she would not 'risk [her] safety and appear in Judge Rundle's courtroom.'

"171.     The respondent did not appear at the October 2, 2018, hearing before Judge Rundle. Following the hearing, Judge Rundle issued an order. In the order, Judge Rundle noted that neither the respondent nor her client appeared for the hearing. Judge Rundle disqualified the respondent from representing R.T. in the case based on a concurrent conflict of interest, under KRPC 1.7(a)(2). Judge Rundle also concluded that '[t]he Court is simply unable to administer a case in an orderly manner if an attorney refuses to appear.'

"172.     Judge Rundle continued the case to December 11, 2018, and deferred entering an order or finding regarding the respondent's contempt of court 'through her intentional and deliberate failure to appear.'

"173.     On October 3, 2018, based on Judge Rundle's October 2, 2018, order, Mr. Whalen filed a motion to disqualify the respondent from her representation of R.T. before the Court of Appeals.

"174.     On October 8, 2018, the respondent filed a motion to transfer venue.

28

"175.    On October 9, 2018, the respondent filed a response to Mr. Whalen's motion to disqualify the respondent from the representation of R.T. before the Court of Appeals. In the response, the respondent asserted that Judge Rundle, Judge Dewey, and Mr. Whalen 'were well aware that [the respondent] was in another judge's courtroom on the same floor awaiting to be notified of [Judge Dewey]'s continuance ruling pursuant to Local Rule 400, or to be called to Judge Rundle's courtroom.' In a footnote, the respondent explained that Rule 400 provides that '[a]ll requests for continuances of motions, evidentiary hearings and trials shall be heard only by the Presiding Judge, unless another judge has been assigned this duty by the Presiding Judge.' The respondent also described Mr. Whalen's motion to disqualify the respondent 'as a tool of harassment.'

"176.    On October 10, 2018, Mr. Whalen filed a response to the respondent's motion to transfer venue.

"177.    R.T. filed an affidavit and indicated that he wished to continue to be represented by the respondent. Because R.T. wanted the respondent to continue to represent him and because the issue of the respondent's disqualification in district court was not pending on appeal, on October 10, 2018, the Court of Appeals denied the motion to disqualify the respondent from representing R.T. in the pending appeal.

"178.    On October 12, 2018, Judge Rundle denied the respondent's motion to transfer venue without a hearing under Rule 133(c) because 'oral argument on the motion would not materially aid the court in resolving the matter.' Judge Rundle also noted that the respondent had recently refused to appear in his courtroom. He also stated that in another case, the respondent appeared by telephone without the permission of the court. At the time of the respondent's telephonic appearance, the respondent was in a Colorado courtroom. In the order, Judge Rundle restated the respondent's disqualification from further representation of R.T. in the district court case. Judge Rundle directed the clerk to refuse to file any pleadings in R.T.'s case presented by the respondent.

"179.    R.T.'s appellate brief was due on October 18, 2018. The respondent failed to file a brief or request an extension of time to file a brief on behalf of R.T.

"180.    On October 23, 2018, the respondent posted a comment on her firm's Facebook page which read, '[d]o you know what happens when you report Sedgwick County Judges for racketeering? Your 3 year old cousin is murdered within two months. Goodness someone needs to clean house over there.'

"181.    On October 29, 2018, the respondent sent an email message to Mr. Yost in his capacity as Sedgwick County Counselor. The respondent stated that Chief Judge Fleetwood continued to engage in criminal obstruction and that he accused her of threatening him. She informed Mr. Yost that she had filed criminal complaints with the Wichita Police Department and the Federal Bureau of Investigation. The respondent also indicated that she was about to file a lawsuit in federal court against the clerk of the district court and others for 'aid[ing] and acquiesc[ing] in retaliatory obstruction.' Finally, referencing an appearance before Judge Phillip Journey scheduled for the following day, she stated:

'If I need to show up with Federal Marshalls [*sic*] please advise. Otherwise please see this email as my kind request to cease and desist efforts to put me in jail with my cousin's murderers in retaliation for complying with federal officers investigating racketeering in Sedgwick County.'

"182.    Also, on October 29, 2018, the respondent sent an email message to Special Agent Jonathan Weishaar of the Health and Human Services Office of the Inspector General. In the email to the federal investigator, the respondent stated that Chief Judge Fleetwood 'left the obstruction of justice in [E.B.]'s case on my voicemail. I am not sure whether this information is helpful to you. But this threat of arrest is the fourth or fifth since it was discovered that [E.B.] died within 3 days of Fleetwood's May 16, 2017 obstruction.' Agent Weishaar took no law enforcement action as a result of the respondent's communication.

"183.    On November 8, 2018, the Court of Appeals directed the respondent to file a brief on behalf of R.T. by November 28, 2018, or the appeal would be dismissed without further notice. The Court also directed that if R.T. did not wish to pursue the appeal, then the respondent should file a notice of voluntary dismissal. The respondent did not file a brief or notice.

30

"184.   On December 7, 2018, the respondent filed suit in federal court on behalf of R.T. The respondent brought claims, including constitutional claims and a RICO claim under 42 U.S.C. § 1983, 42 U.S.C. § 1988, and 18 U.S.C. § 1962. The respondent named the Sedgwick County board of county commissioners, Chief Judge Fleetwood, Judge Dewey, Judge Rundle, the court trustee, the district court clerk, the sheriff, and M.S. as defendants in the case. The respondent asserted that the defendants engaged in possible illegal collusion and she filed the complaint 'to remediate acts of plausible retaliatory obstruction after state appeal and contemporaneous to [the respondent]'s cooperation with federal agents investigating Sedgwick, Wyandotte and Johnson counties for racketeering in domestic and juvenile courts.' The respondent sought:

    a.   disqualification of Chief Judge Fleetwood, Judge Dewey, and Judge Rundle from R.T.'s case;

    b.   transfer of venue from Sedgwick County to Cowley County;

    c.   a stay of Judge Rundle's orders, including his order disqualifying the respondent;

    d.   an injunction preventing further filings in the child support case;

    e.   federal reorganization, appointment of trustee, and removal of officers in the Sedgwick County Trustee's Office;

    f.   R.T.'s costs and treble attorney's fees; and

    g.   other relief as the federal court deemed just and proper.

In her request for other relief, the respondent requested, 'prospective and/or retroactive injunctive relief . . ., declaratory relief, compensatory damages, punitive damages, pain and suffering, statutory damages (including treble damages and/or fines), reimbursement of funds paid or lost, class action certification, attorneys fees and/or costs.'

"185.   On December 27, 2018, the Court of Appeals dismissed R.T.'s appeal because the respondent failed to file a brief or otherwise respond to the court's order. Thereafter, the respondent failed to take any action to revive R.T.'s appeal.

"186.   On January 6, 2019, the respondent filed a notice of appeal seeking a writ of mandamus. The respondent filed the notice in Sedgwick County District Court.

31

On February 1, 2019, Mr. Whalen sent the respondent an email that stated: '[a]nd just an FYI, there is no Notice of Appeal for a Writ of Mandamus. It is an original action filed directly in the appellate courts.'

"187.    On January 9, 2019, Mr. Whalen filed a motion for attorney's fees in the Court of Appeals case. The following week, on January 15, 2019, the respondent filed a response to the motion for fees requesting that the court deny the motion. The respondent asserted that M.S. 'was well-aware of her status as a Defendant in federal diversity proceedings for Abuse of Process. Her counsel Michael Whalen received [a] Summons on December 26, 2018 [*sic*] along with the complaint and demand to cease and desist further unnecessary motion practice.'

"188.    On January 17, 2019, the Court of Appeals granted Mr. Whalen's motion for attorney's fees. Under Rule 7.07(b), the court ordered R.T. to pay Mr. Whalen's fee of $960.

"189.    On September 30, 2019, the federal district court issued a memorandum decision dismissing the case. The court dismissed the claims for injunctive relief because the *Younger* abstention doctrine, the *Rooker-Feldman* doctrine, and the domestic relations exception precluded the court from exercising jurisdiction over R.T.'s claim for injunctive relief. The court dismissed the claims for money damages based on the Eleventh Amendment, judicial immunity, and the failure to state plausible 42 U.S.C. § 1983 and RICO claims.

"190.    Neither R.T. nor the respondent paid the $4,440 to Mr. Bernhardt. The respondent provided Mr. Whalen a check drawn on the respondent's law firm's bank account, for $960. The record is unclear whether the funds came from R.T. or the respondent.

"Representation of Z.W. and N.W.

"191.    In May, 2018, Z.W. and N.W. retained the respondent to represent them in relation to the custody of A.B. and H.D. Z.W. and N.W. were the maternal grandparents of A.B. and H.D.

32

"192. On May 5, 2018, the respondent filed a notice of motion to intervene and cease and desist against unreasonable state intervention and administration of life-ending medical care in A.B.'s parents' family law case, Sedgwick County District Court case number 17DM2676. In the notice, the respondent asserted that A.B. was found on May 4, 2018, with life-threatening injuries, was taken to Wesley Medical Center, and was not expected to survive. Z.W. and N.W.'s daughter was arrested in relation to A.B.'s injuries.

"193. While the respondent filed a notice, she did not file a motion to intervene. And, despite the title, through the notice, the respondent requested that the grandparents be given legal custody.

"194. The portion of the document which can be described as the respondent's cease and desist command filed in the family law case to which the respondent's clients were not parties, included the following:

'FURTHERMORE, due to the mishandling of this child's known physical abuse by his mother[,] by state actors, and the well-known public acknowledgment of the State's current fatal incompetence in handling child abuse cases, PLEASE BE ADVISED THAT THE STATE OF KANSAS, DEPARTMENT OF CHILD AND FAMILY SERVICES, THE EIGHTEENTH JUDICIAL DISTRICT and/or THE WICHITA POLICE DEPARTMENT are hereby prohibited, under notice of federal cease and desist, from filing petition to seek State custody or otherwise interfere with Intervenors' efforts to secure custody of this child without proper Constitutional showing of probable cause. . . .

'As to Wesley Medical Center, PLEASE BE ADVISED of Intervenor's pending emergency actions to petition for the legal status as [A.B.'s] power of attorney to make medical decisions, with acknowledgment of notice of cease and desist against Mother and any State entity to make any DNR or end-of-life decisions for the child. Counsel for Wesley is advised to contact the undersigned attorney immediately and prior to allowing consent to administer life-ending medical actions.'

33

The respondent's clients, Wesley Medical Center, the Wichita Police Department, and the Kansas State Department of Children and Families (DCF) were not parties to the case.

"195.    Unfortunately, on May 6, 2018, A.B. succumbed to his injuries. The Sedgwick County District Attorney's office charged A.B.'s mother and another person with child abuse and murder.

"196.    The Sedgwick County District Attorney's office filed a CINC case regarding H.D., A.B.'s younger sibling, Sedgwick County District Court case number 18JC260. On May 11, 2018, the respondent sent an email requesting discovery on behalf of Z.W. and N.W. Three days later, the respondent filed a motion for expedited discovery in the CINC case on behalf of Z.W. and N.W. Through the motion, the respondent sought medical records, DCF records, law enforcement records, and other records relating to both A.B. and H.D. The district court set a hearing on the motion for May 18, 2018.

"197.    On May 17, 2018, the district court exchanged email messages with the parties and with the respondent regarding a possible continuance of the hearing on the discovery motion. In response to the exchange of email messages, the respondent sent an email to the court and copied approximately 15 others on the email message. In the message, the respondent stated that by neglecting to check the box acknowledging a grandparent's request for custody, the district attorney's office engaged in conduct that 'very much looks like fraud.' The hearing on the respondent's discovery motion was not continued.

"198.    On May 18, 2018, Ron Paschal from the district attorney's office replied:

'Members of this office will have no communication outside of court with Ms. Johnston. Early on Ms. Johnston sent an email telling counsel that emails should only be used for scheduling purposes and then into the late hours of the night used email to lodge false and malicious allegations of misconduct against a lawyer in the case. Ms. Johnston, you have sent other emails and voicemails of this tenor. This course of conduct is not productive and therefore we will not participate.

34

'Any recommendations from the District Attorney regarding custody and placement in this case will be guided by the home studies ordered by the court and conducted herein and not as a result of threats from counsel.'

"199. The district court conducted the hearing on the discovery motion on May 18, 2018. The court noted that the hearing related only to H.D. and not to A.B. The district attorney's office objected to the release of records related to A.B. The court denied the respondent's request as it related to A.B. The court granted the respondent's motion as it related to H.D.

"200. On June 13, 2018, even though Z.W. and N.W. did not have standing in the family law case involving their daughter (case number 17DM2676), and even though only a party to a case may request business records by subpoenas under K.S.A. 60-245a, the respondent issued business records subpoenas under K.S.A. 60-245a, through the family law case to Wesley Medical Center, the Sedgwick County Forensic, DCF, and the Wichita Police Department seeking records relating to A.B.

"201. The Wichita Police Department filed an objection to the respondent's business records subpoena. DCF filed a motion to quash the respondent's business records subpoenas.

"202. Wesley Medical Center and Sedgwick County Forensic honored the respondent's subpoenas and provided A.B.'s medical records and autopsy report, respectively, to the respondent.

"203. On July 25, 2018, Mr. Paschal filed a complaint against the respondent regarding her conduct in the CINC case involving H.D., as well as the respondent's conduct in another CINC case. *See* ¶¶ 210-243 below.

"204. By August 9, 2018, the respondent provided the medical records and the autopsy report to the Wichita Eagle news outlet.

35

"205.    The respondent notified the district attorney's office that she obtained A.B.'s medical records and autopsy report and that she provided the medical records and autopsy report to the Wichita Eagle.

"206.    Marc Bennett, Sedgwick County District Attorney, responded to the respondent's email message:

. . . .

'As you are aware there are three separate legal proceedings currently pending before the 18th Judicial District Court. Two are murder cases and one is a child in need of care case. To be clear, given the pending nature of these proceedings, the state cannot condone the release of records you reference for the reasons stated in Kansas Rules of Professional Conduct 3.6(a).

'Further, parental rights are still legally intact and a jury trial has not yet been held in the criminal matters in the very jurisdiction into which you indicate you intend to release this information. I do not know the legal purpose for which you requested the subpoena or what legal purpose is to be served by the release of the information gathered as a result of said subpoena. Again, I would refer you to KRPC 3.6.'

"207.    The next day, on August 10, 2018, the respondent sent an email to the district attorney's office. She stated that '[w]e need to request all of Monday's hearing be closed to the public because details material to a homicide investigation are going to be disclosed.' She also stated that there would be no reporting of the Wesley documents in her possession before Monday. However, she warned that if the district attorney's office did not close the Monday hearing, 'the State's murder case could be compromised . . . .'

"208.    On September 12, 2018, the respondent filed a response to the outstanding disciplinary complaints. In response, the respondent indicated that she voluntarily and temporarily refrained from disclosing certain documents publicly. The respondent described the disciplinary complaints made against her as 'part of an

36

enterprise of intimidation by State Actors to force [her] out of business in two states and to cover up Kansas court activities that have enabled the murder and sexual exploitation of children.' She also stated:

'Most egregious of the conspiratorial acts occurred when Sedgwick County Chief Administrative Judge James Fleetwood obstructed justice and prevented the rescue of [E.B.], my cousin, in the 72 hours before the child's murder on May 19, 2017. Judge Fleetwood intercepted my communication to the presiding family law judge at that time, . . . and prohibited emergency orders to assist law enforcement in rescuing the child.'

"209.    In response to a January 16, 2019, email about scheduling a hearing in the CINC case involving H.D., the respondent sent an email message to Mr. Paschal and other counsel which read:

'I am not sure how Ron Paschal became a part of this email chain. He needs to be removed. Ron likes to file malicious and defamatory ethical complaints on me in actions with many other attorneys and then make everyone witnesses to federal investigations into his failed attempts at criminal obstruction. It is clear after my documents and statements became part of [S.B.]'s monumental sentence that I am a help, not a hindrance, to the prosecution of abuse cases. Paschal, however, has criminally suspect motivations. Let me know if I need to request a federal injunction to have him forcibly removed from this case.'

Mr. Bennett responded to the respondent's message and took:

'. . . great exception to [her] baseless and highly unprofessional allegations that Mr. Paschal has engaged in "*failed attempts at criminal obstruction*" and that he has "*criminally suspect motivations*." Personal, unfounded attacks like this against a well-respected, long standing member of the bar, diminish the profession. Frankly, these are the kind of inflammatory comments I might expect from a non-attorney, litigant.' (emphasis in original).

"Representation of K.V.

"210.    K.V. and R.V. divorced. At the time of the divorce, K.V. and R.V. had one minor child, N.V. In the family law case, Sedgwick County District Court case number 14DM7672, the court awarded residential placement of N.V. to K.V. R.V. had parenting time every other weekend.

"211.    In May 2018, K.V. reported to DCF that R.V. physically and sexually abused their child. While DCF and the Exploited and Missing Children's Unit (EMCU) were investigating the allegations, on June 4, 2018, K.V. filed a protection from abuse (PFA) action, Sedgwick County District Court case number 18DM3792, against R.V. In the PFA petition, K.V. made the same allegations of physical and sexual abuse by R.V.

"212.    On June 4, 2018, the district court granted a temporary PFA order. The order temporarily suspended R.V.'s parenting time until further order of the court.

"213.    On June 28, 2018, Judge Gregory Waller held an evidentiary hearing on the PFA matter. Trip Shawver represented K.V. and R.V. appeared pro se. During the hearing, R.V. produced a letter from Sarah Hoss of the EMCU, dated June 27, 2018. In the letter, Ms. Hoss stated that there was insufficient evidence to support the allegations against R.V. She also stated that there were ongoing concerns that K.V. and K.V.'s mother had been coaching the child to make false allegations of abuse against R.V. Ms. Hoss recommended that the PFA case be dismissed and that the case be presented to the district attorney's office for consideration of a CINC case. Mr. Shawver asked the judge to continue the PFA hearing pending the results of the DCF investigation. Judge Waller granted Mr. Shawver's motion to continue, scheduled the PFA case for August 9, 2018, and modified the temporary order allowing R.V. to have supervised visitation pending the next hearing.

"214.    On July 1, 2018, K.V. retained the respondent to represent her in the family law case, the PFA case, and the potential CINC case.

"215.    That same day, K.V. and the child moved from Sedgwick County to the home of G.K. and K.K., in Butler County, Kansas. That evening, the respondent prepared

38

a durable power of attorney purporting to provide G.K. and K.K. with legal rights regarding N.V. Neither the respondent nor K.V. sought permission or authorization from R.V. regarding the execution of a power of attorney concerning N.V.

"216.   On July 2, 2018, the respondent sent an email message to Amanda Marino at the Sedgwick County District Attorney's office which provided:

'[K.V.] hired me yesterday in her custody case. She is under the impression EMCU has requested a CINC application to be presented to the DA's office with request for ex parte orders today. Are you handling this case? If not, could you advise who is? . . .

'Issuance of ex parte orders after a PFA hearing finding good cause for my client's complaints seems improbable, but I thought I would inquire just in case.'

Ms. Marino replied to the message and informed the respondent that Bradley Burge was handling the case. Ms. Marino copied Mr. Burge on the response. Mr. Burge also wrote to the respondent and indicated that he had been told another person was going to be representing K.V. As a result, Mr. Burge asked the respondent to enter her appearance so he could discuss the case with her.

"217.   Meanwhile, on July 2, 2018, DCF submitted a CINC application. DCF obtained an ex parte order of protective custody granting DCF temporary custody of N.V. and authorizing law enforcement to pick up the child. The court entered the order at 10:38 a.m. that day.

"218.   As provided by K.S.A. 38-2242, the ex parte order of protective custody was issued without prior notice or hearing. Also, according to K.S.A. 38-2242 and 38-2243, the protective custody order is temporary pending a hearing which must be held within 72 hours after the child is taken into custody. The district court scheduled the temporary custody hearing for July 5, 2018.

"219.    During the afternoon of July 2, 2018, Mr. Burge filed the CINC petition in Sedgwick County District Court, case number 18JC337. The respondent entered her appearance at 4:25 p.m.

"220.    On July 2, 2018, the respondent also entered her appearance on behalf of K.V. in the family law case and the PFA action.

"221.    On July 2, 2018, the respondent sent an email message to Mr. Paschal. In the message, the respondent stated that she had been communicating with the district attorney's office to 'prevent the need for any warrant or ex parte orders' and that she was able to enter her appearance before 'any ex parte hearing.'

"222.    That evening, law enforcement went to the home of G.K. and K.K. in Butler County, Kansas, to take custody of the child. No one answered the door.

"223.    On July 3, 2018, Mr. Paschal responded to the respondent's email informing the respondent that an ex parte order placing the child in the temporary custody of DCF had been entered the previous day, but that law enforcement was unable to locate the child. Mr. Paschal asked the respondent to facilitate the change of temporary custody pursuant to the order. The respondent wrote to Mr. Burge and asked how the ex parte order could be vacated.

"224.    Also on July 3, 2018, the respondent informed the district attorney's office and Ms. Hoss that she knew where the child was located, that the child was safe, and that the respondent would seek 'federal intervention in this case if necessary to cease police action to retrieve [N.V.] unlawfully.'

"225.    On July 5, 2018, the respondent filed a motion to dismiss the CINC case and vacate the ex parte orders. In the motion, the respondent falsely asserted that on June 28, 2018, Judge Waller found allegations of abuse alleged by K.V. to be more probable than not. The respondent falsely asserted that prior to the initiation of the CINC case, N.V. was placed under the legal guardianship of others who are not subject to Sedgwick County jurisdiction. She accused the district attorney's office of 'judge shopping' for the 'purpose of unconstitutional and illegal seizure' of N.V.

40

"226.    She also 'politely suggested' that Sedgwick County District Court judges 'cease the practice of approving ex parte orders proposed by Kansas DCF' because '[t]hey are not needed. Law enforcement can take emergency custody in under [*sic*] well-established warrantless seizure protocols, and the District Attorney may otherwise follow normal protocol to procure a warrant when time allows.'

"227.    Finally, the respondent asserted that there are 'widespread allegations of ex parte order abuse in Kansas by DCF in order to "kidnap" persons considered "marketable" for state profit' and the respondent suggested that the court 'take heed and voluntarily cease the practice to prevent further escalation of the rumored racketeering.'

"228.    On July 5, 2018, the district court held a temporary custody hearing. While the case was assigned to Judge Smith, Judge Greg Keith handled the hearing because Judge Smith was on vacation. At the time of the hearing, law enforcement had not located the child. The court ordered the respondent and K.V. to produce the child. The respondent argued that the court could not order her to produce the child because she did not have custody of the child.

> 'So, Your Honor, for—to order me to produce the child—she's not in my care. The—it—I made it known where the child was. If you all want to order them—the people who have the child right now—to come and produce her, that's fine. That's within the Court's powers and certainly within the powers of the District Attorney's Office. But to just circumvent all of that and not give notice, not respond to my inquiries and just come after me and ask me to produce the child is not—not the most efficient way of handling things, especially when I tried so—put forth so many efforts to communicate with everybody and coordinate this effort, which, for whatever reason, it didn't work.'

The respondent refused to produce the child. The court informed the respondent and K.V. that they could choose between bringing the child to the courthouse or having law enforcement or DCF pick up the child. After consultation with the respondent, K.V. refused to produce the child and stated that law enforcement or DCF would have to pick up the child.

41

"229.	After the child was in custody, Judge Keith proposed continuing the temporary custody hearing to July 9, 2018, so that Judge Smith could hold the hearing. The respondent objected because she 'filed a motion to prevent the child from being taken into State custody.'

"230.	Over the respondent's objection, the district court continued the temporary custody hearing to July 9, 2018, before Judge Smith. The court also continued the hearing on the respondent's motion to dismiss and vacate the ex parte orders.

"231.	On July 6, 2018, the respondent shared a post on her firm's Facebook page, Excellence Legal, LLC, in which she stated:

'Alright Kansas . . . stay tuned for fireworks on Monday, in public hearing in the Sedgwick County courtroom of Judge Kevin Smith. This is not just a border problem. Children are being stolen by DCF from homes in places like Andover, Kansas and separated from their parents after one parent made complaints of abuse. . . . So beware! If you report the abuse of your child and DCF can't substantiate, your child may be seized from your home without notice and with no evidence of imminent danger.'

"232.	On July 8, 2018, the respondent filed a supplemental motion to dismiss. In the supplemental motion, the respondent repeated her inaccurate assertion that on June 28, 2018, Judge Waller found K.V.'s allegations of abuse against R.V. to be more probable than not and that Judge Waller 'awarded restraining orders to protect' N.V. from R.V. The respondent asserted that the initiation of the CINC case to be a violation of N.V.'s 'fundamental Constitutional right to privacy and protections against unreasonable seizure as well as [K.V.]'s fundamental right to make decisions concerning the health, safety and welfare of [N.V.] without threat of unreasonable state interference.'

"233.	The respondent also argued that members of the district attorney's office and DCF caused N.V. 'unnecessary emotional distress.' In the motion, the respondent stated that K.V. intended to file a federal case seeking an injunction for the illegal seizure of N.V., for policies and customs violative of civil rights, and for 'claims of defamation,

42

invasion of privacy, abuse of process, malicious prosecution, trespass, and nuisance.' The respondent urged that the CINC case should be dismissed because the district court lacked jurisdiction and because venue was improper in Sedgwick County.

"234.    Despite her refusal to disclose the location of the child during the hearing held on July 5, 2018, in the motion, the respondent asserted 'that the undersigned was available, willing and cooperative in disclosing information about Child's location before any action was filed, but that multiple state actors just refused to discuss the matter' with the respondent.

"235.    On July 8, 2018, the respondent filed a motion in limine, repeated her allegations that N.V.'s constitutional rights were violated, and argued that any evidence obtained during N.V.'s 'unlawful seizure should be excluded from this court's consideration because the benefit of deterrence of this behavior by state actors outweighs the substantial social costs.'

"236.    On July 9, 2018, Judge Smith held a temporary custody hearing. During the hearing, Judge Smith asked the respondent how many CINC cases she had handled previously. The respondent reported that she had previously handled '20, 30, perhaps 40' CINC cases. However, according to the records of the Sedgwick County District Court, the respondent had been attorney of record in only *In re H.D.* and *In re N.V.* In response to disciplinary complaints, the respondent included a chart that listed her experience in family law. According to the respondent's chart, she also handled one additional CINC case in Wilson County. Notwithstanding her chart, the respondent also stated in her response to Judge Smith's disciplinary complaint that she handled cases while she was in 'law school in Shawnee County and in various counties throughout the State.' *But see* [. . .] (The respondent informed Judge Sanders in her personal family law case, 'I don't practice, . . . I have an active license, but I'm a litigation manager and I do global compliance. I mean, I don't do family law. I do chemical regulations.').

"237.    The respondent also stated that the transcript of the July 9, 2018, hearing 'provides evidence of [Judge Smith]'s legal inexperience, not mine, and is frivolous.'

"238.    When questioned by Judge Smith about her statement that Judge Waller found K.V.'s allegations of abuse by R.V. to be more probable than not, the respondent defended stating, 'this is how a PFA petition is maintained. If it's not dismissed, then the assumption is that the findings are going forward on a preponderance of the evidence, which is more probably true than not true.' When Judge Smith explained to the respondent how PFA cases work, the respondent argued with the judge and then stated that they would be headed to federal court 'unless there are probable cause findings supporting the fact that this child has a need for state intervention.'

"239.    At the July 9, 2018, hearing, based on the exhibits provided by the respondent, the district court found that N.V. was in immediate danger of psychological abuse by K.V. The court placed N.V. in the temporary custody of DCF. The court provided DCF the discretion to place the child with R.V. and provide K.V. with supervised visits. The court denied the respondent's motions.

"240.    The court also found that because K.V. knew that the case would be presented to the district attorney's office for consideration of a CINC proceeding, by executing the power of attorney in favor of G.K. and K.K. and by moving the child out-of-county, K.V. attempted to circumvent the process and avoid the jurisdiction of the court.

"241.    On July 26, 2018, Judge Smith lodged a disciplinary complaint against the respondent concerning her conduct in *In the Interest of N.V.*, Sedgwick County District Court case number 18JC337.

"242.    On August 8, 2018, the respondent filed a motion to withdraw from her representation of K.V. in the CINC case.

"243.    On January 18, 2020, the respondent made the following post on her law firm's Facebook account:

'If you live in Sedgwick County, vote against Judge Kevin Smith. He and Governor Laura Kelly appear to be the only two Kansans who think we need MORE non-abused kids in foster care. A great question to ask:  how many 9-13

44

year old girls did he place in foster care during his time on the bench? This judge has virtually no legal experience, diminished social skills and unabashedly markets on behalf of private organizations that contribute fraudulently to the foster care to [*sic*] human trafficking pipeline. Remove him, Sedgwick County.'

"Representation of D.F.

"244. The respondent represented D.F., the mother, in a paternity case, *J.A. vs. D.F.*, Sedgwick County District Court case number 14DM6869, regarding the minor child, T.A. Joseph Garcia represented the father, J.A.

"245. On August 25, 2018, the district court adopted the guardian ad litem's recommendation that T.A. resume overnight visits with J.A. beginning the following day. The court ordered that T.A. be allowed to take a cell phone with her and that she be allowed to call D.F. at bedtime.

"246. While T.A. was on her visit, D.F. could not locate T.A. through the phone's global positioning system (GPS). As a result, the respondent sent an email message to Mr. Garcia, the guardian ad litem, and others, indicating that T.A.'s phone was supposed to register T.A.'s location through the phone's GPS. The respondent stated that she attempted to make 'contact with mutual friends' to avoid engaging in ex parte communications. The respondent indicated that if she did not obtain confirmation of T.A.'s safety, the respondent would be calling law enforcement for a welfare check.

"247. The respondent sent a text message to A.A., J.A.'s wife. The respondent identified herself and stated that the GPS feature was supposed to be activated on T.A.'s phone. The respondent directed A.A. to have her husband contact D.F. or the respondent within one hour or she would be calling law enforcement for a welfare check.

"248. A.A. responded to the respondent, indicating that it was inappropriate for the respondent to contact A.A. She also indicated that they were in compliance with the court order. Finally, A.A. stated that if the respondent needed something from J.A. that the respondent should contact Mr. Garcia.

"249.    On September 4, 2018, A.A. made a complaint with the disciplinary administrator regarding the respondent's contact on August 25, 2018. On October 25, 2018, the respondent communicated with the disciplinary investigator assigned to investigate A.A.'s complaint against the respondent. The respondent did not respond to the allegation made by A.A. Rather, the respondent stated:

. . . .

'[A.A.], the complainant in this matter, is a Sedgwick County employee against whom I asserted misconduct/breach of confidentiality. As a result, Judge Tyler Roush sealed the court file pertaining to this case. [A.A.] is expressly not a party to this litigation. Thus I am limited in how I can respond without Judge Roush's order and/or a protective order. . . . '

*But see* KRPC 1.6(b)(3). ('A lawyer may reveal such information to the extent the lawyer reasonably believes necessary . . . to respond to allegations in any proceeding concerning the lawyer's representation of the client.')

"250.    In January 2019, the respondent sent an email to Mr. Garcia asserting that someone in Sedgwick County spread a rumor that D.F. had a pending legal issue in Derby, Kansas. And, as a result of the rumor, D.F. was being threatened with incarceration in Sedgwick County for six months. The respondent also stated, '[A.A.] is named as a pending defendant in a Civil RICO and 1983 action for collusion with other state actors to deprive my client of civil rights.' The respondent's statement that A.A. was named as a defendant in federal litigation was false.

"251.    On September 6, 2019, the district court entered a permanent parenting plan. The parenting plan included a provision that T.A. continue in therapy with B.W.

"252.    On February 10, 2020, the respondent sent an email message to B.W. In the email message, on behalf of D.F., the respondent terminated B.W.'s services. The respondent informed B.W. that she was not welcome to attend T.A.'s individualized education plan meeting, that B.W. was prohibited from speaking with anyone about T.A.,

46

and that B.W. would not be providing services to T.A. until B.W. overcame the objection that B.W. medically neglected T.A.

"253.    The next day, D.F. filed a pro se motion. In the motion, D.F. stated that the respondent's email message sent on February 10, 2020, was sent without her permission and authority. D.F. also stated that the respondent's email was a misrepresentation.

"254.    On May 1, 2020, the respondent filed a verified motion for amended temporary orders. In the motion, the respondent asserted that

'In September 2019, Father's Wife commenced discussions about puberty with Child and bought her training bras without prior discussion with Mother, the child's therapist nor any medical provider. At the time Child was barely 8 years old and of slight build, showing no sign, nor need for, such attention. Child had not requested information about puberty and had not asked for such a purchase to be made. . . . Father's Wife's conduct caused Child confusion, intervention by the child [*sic*] therapist and Father's Wife took no responsibility for her actions. . . . Instead, Father's Wife refused to participate in a remedy for the problem and blamed Child for being confused (aka, she called Child a liar for relaying information that Child was not mature enough to understand).'

Approximately eight months before the respondent filed the motion for amended temporary orders, the respondent knew that the allegations quoted above were untrue. In a May 15, 2020, order, the district court concluded that the respondent's inclusion of those allegations was misguided. Later, on July 2, 2020, the court sanctioned the respondent $500 for including those allegations in her motion.

"Representation of K.E.

"255.    In *In re Marriage of J.C. and K.E.*, Sedgwick County case number 14DM2056, the district court entered a decree of divorce and a permanent parenting plan regarding the parties two children, G.E.C. and E.E. The parties were awarded joint legal custody. The court awarded J.C. primary residential custody and K.E. parenting time.

47

"256.	In 2015, the district attorney's office filed CINC proceedings regarding G.E.C. and E.E. in Sedgwick County District Court cases numbered 15JC82 and 15JC83. On April 27, 2015, the district court adjudicated both children as CINC. G.E.C. and E.E. were placed in the custody of DCF.

"257.	In November 2016, the parties reached an agreement on a proposed parenting plan. Under the parenting plan, J.C. received primary residential custody and K.E. received parenting time. The district court approved the plan. The court directed that the plan be filed in both the CINC cases and the family law case. The court closed the CINC cases.

"258.	The parties followed the permanent parenting plan from November 2016 until December 2018. On December 9, 2018, J.C. informed K.E. verbally of her intent to move to the state of Kentucky. J.C. stated that she and her husband obtained jobs in Kentucky. K.E. verbally expressed his objection to J.C. moving the children out of state. J.C. suggested that they seek to mediate the issue, without court involvement. K.E. did not agree to mediation.

"259.	On December 12, 2018, J.C. provided written statutory notice of intent to move in accordance with K.S.A. 23-3222. In the hand-written notice, J.C. gave K.E. the address where they would be living and the name of the school the children would be attending. J.C. informed K.E. that she would be starting her new job on January 7, 2019. In the notice, J.C. informed K.E. that she would continue to comply with the existing parenting plan.

"260.	Under the parenting plan, the parents were to divide the winter school break. K.E. had parenting time from December 19, 2018, to December 26, 2018, and J.C. had parenting time from December 26, 2018, through January 4, 2019.

"261.	J.C. informed K.E. that she intended to move the children to Kentucky after K.E.'s weekend parenting time on January 7, 2019, and that she would continue to comply with the existing parenting plan until the district court changed the plan.

48

"262.     By December 21, 2018, K.E. retained the respondent. The respondent drafted and K.E. executed a petition for abduction prevention measures. The petition was a fillable form. In the petition, the respondent falsely stated that the children resided with K.E. and his wife from January, 2018 to the present. The form required the disclosure of all cases involving custody, allocation of decision making, or parenting time with the children. While the respondent included references to the two closed CINC cases, the respondent failed to disclose the ongoing family law case. The respondent asserted that J.C. threatened to abduct the children, that J.C. recently engaged in activities that may indicate a planned abduction by abandoning employment, terminating a lease, refusing to follow the parenting plan, and having strong ties to another state. In the petition for abduction prevention measures, the respondent sought primary residential custody for K.E. and supervised visitation for J.C.

"263.     On December 26, 2018, the respondent filed the petition for abduction prevention measures, Sedgwick County District Court case number 18DM9069. Along with the petition, the respondent also filed a proposed order. A hearing on the petition was scheduled for January 7, 2019.

"264.     The district court modified the order drafted by the respondent. In the order, the court made it clear that as long as J.C. was in Kansas, the existing parenting plan would remain in place.

"265.     On December 26, 2018, K.E. refused to return the children to J.C. J.C. called the Wichita Police Department for assistance in gaining physical custody of her children. The officers reviewed the orders from the CINC cases as well as the order issued that same day in the abduction case. The officers concluded that they would not assist J.C. in obtaining physical custody of the children because there were conflicting orders.

"266.     On December 27, 2018, J.C. retained Jennifer Wagle. That same day, Ms. Wagle sent the respondent an email message and clearly stated that J.C. would remain in Kansas until the issue of residential custody of the children was resolved. Ms. Wagle reminded the respondent of the court orders in place regarding residential custody.

49

"267. On December 28, 2018, the respondent responded to Ms. Wagle's email message. In the response, the respondent indicated that she did not have a copy of the parenting plan and asked Ms. Wagle to provide her with a copy.

"268. Ms. Wagle provided the respondent with a copy of the parenting plan on January 2, 2019. In the email message transmitting the parenting plan, Ms. Wagle pointed out to the respondent that J.C. provided K.E. the required notice of her intention to relocate and that K.E. did not file an objection to the notice.

"269. Ms. Wagle informed the respondent that she would be attempting to meet with the judge about the case at 9:00 a.m. the following morning. She also informed the respondent that she would be seeking sanctions for the time Ms. Wagle spent trying to get K.E. to comply with the district court's orders.

"270. Ms. Wagle filed an answer and counter-petition to the respondent's petition for abduction prevention measures.

"271. On January 3, 2019, shortly before 9:00 a.m., the respondent sent Judge Tyler Roush an email message. In the message, the respondent asserted that:

'1. Wichita Police were requested to enforce your order last week at the planned exchange. WPD reviewed information I did not have and advised me on the phone that the risk of the out of state [*sic*] abduction was too great for them to enforce your order and they were declining to assist in a transfer of the children to [J.C.]. They advised the children should stay with my client until [the] hearing on Monday.

'2. I requested information and documentation from Ms. Wagle one week ago and received a partial response yesterday that did not cure the controversy.

'3. There are no actual orders as to any parenting time that I have thus far encountered subsequent to [the] CINC petition.

'4.    Finally, [J.C.]'s vehicle was photographed attached to a Uhaul yesterday evening at her Wichita address . . . .

. . . .

'6.    [J.C.] intends to abscond with the children today before Monday's hearing. . . .

The respondent's message included false statements. The police did not assist J.C. in retrieving the children because of the conflicting orders, not because the risk of abduction was too great. Additionally, the respondent's statement that there was not an existing order regarding parenting time was untrue. When the court entered a temporary order in the abduction prevention case, the court referenced the existing parenting order filed in the closed CINC cases and the family law case.

"272.    Judge Roush conducted a short hearing on January 3, 2019. Ms. Wagle told the court that she was uncertain whether the CINC cases remained pending but that J.C. believed the CINC cases to be closed. Judge Roush informed both parties that the CINC cases were closed in November 2016 and that the parenting plan was filed in both the CINC cases as well as the family law case. Ms. Wagle informed the court that J.C. would remain in Kansas until the issue was resolved and she asked the court to order K.E. to return the children to J.C. The respondent argued, based on a photograph of J.C.'s car attached to a U-Haul, that J.C. planned to leave Kansas that day. After hearing the arguments, Judge Roush repeated the ex parte order that the existing parenting plan remained in place as long as J.C. was in Kansas.

"273.    After the January 3, 2019, hearing, Ms. Wagle emailed the respondent and asked when the children would be returned to J.C. The respondent did not respond. Because the respondent did not respond, Ms. Wagle sent an email to Judge Roush and the respondent. In the email message, Ms. Wagle asked Judge Roush whether he would entertain signing an order so that law enforcement could assist J.C. in obtaining physical custody of the children. Judge Roush declined to enter an additional order and warned the parties that he would be closely scrutinizing the parties' actions until the case was resolved.

51

"274.    Ms. Wagle emailed the respondent again that afternoon. Ms. Wagle informed the respondent that J.C. went to school to pick up the children and learned that K.E. picked up the children early and exited out a different door to avoid J.C. The respondent responded to Ms. Wagle's email message, asserting that J.C. was immediately moving out-of-state and, as a result, under Judge Roush's order, K.E. is the primary residential custodian. Ms. Wagle repeated that J.C. was in Kansas and intended to remain in Kansas until the custody issue was resolved.

"275.    On January 3, 2019, Ms. Wagle filed a motion for sanctions and attorney's fees in the family law case, Sedgwick County District Court case number 14DM2056. In the motion, Ms. Wagle asserted that allegations in the petition for abduction prevention measures were false and K.E., with assistance from the respondent, repeatedly refused to return the children to J.C., in violation of the court's order.

"276.    On January 4, 2019, Ms. Wagle filed a motion for sanctions and attorney's fees in the abduction prevention case, Sedgwick County District Court case number 18DM9069. In the motion, Ms. Wagle made the same allegations she made in her motion for sanctions in the family law case.

"277.    On January 6, 2019, a Sunday, the respondent submitted verified petitions for nonconsensual kinship adoption of J.C. and K.E.'s children. The clerk of the district court filed the petitions the following morning, January 7, 2019. The Sedgwick County District Court cases were numbered 19AD7 and 19AD8. The cases were assigned to Judge Robb Rumsey.

"278.    Also on January 6, 2019, a Sunday, the respondent filed a notice of statutory stay. In the notice, the respondent instructed that because K.E. filed termination of parental rights and adoption cases under K.S.A. 59-2136(d)(3), the abduction prevention case and the family law case must be stayed.

"279.    The respondent sought to terminate J.C.'s parental rights. The respondent also sought to have A.E., K.E.'s wife, adopt the children. In the petitions, the respondent made many allegations. The respondent alleged that J.C. was presumed unfit under

52

K.S.A. 38-2271(a)(3) because a child in J.C.'s physical custody had been adjudicated as a CINC on two or more occasions. The respondent alleged that the children resided with A.E. continuously since 2014 and the children resided with J.C. continuously since January 22, 2016.

"280.    Before the scheduled January 7, 2019, hearing, the respondent emailed Judge Roush informing him that the adoption petitions temporarily divested him of jurisdiction.

"281.    On January 7, 2019, Judge Roush conducted a hearing. Judge Roush ordered the abduction prevention case transferred to the family law case. Judge Roush then dismissed the abduction prevention case. Judge Roush permitted Ms. Wagle to make arguments regarding issues identified in her motions for sanctions and attorney's fees and her answer and counter-petition. Judge Roush held that the pending issues would be considered after the adoption proceedings had concluded.

"282.    Judge Roush asked the respondent where the children were. She responded that the children were with K.E. because '[t]his was his regular weekend. He hasn't violated any de facto or court orders.' The judge stayed the family law proceedings until the adoption proceedings had concluded. The judge reminded the parties that the temporary order he entered following the filing of the petition for abduction prevention measures would remain in effect.

> 'So that means if Mom's in Kansas, she gets to have her parenting time pursuant to the old parenting plan, until Judge Rumsey issues some sort of order that supersedes my order. . . . But mine doesn't go away. It doesn't just vanish because you filed a petition in a different court.'

"283.    Ms. Wagle requested that the court issue a written order that J.C. could use to enforce the parenting time. Judge Roush declined to enter an additional order but reiterated that the previous order remained in place. The judge also warned the parties that there would be consequences for failing to comply with court orders.

"284.    After the hearing, Ms. Wagle attempted to talk with the respondent about the children returning to their mother's home. The respondent refused to return the children to J.C. but indicated that J.C. could have four hours of supervised visitation.

"285.    Later that evening, Ms. Wagle sent an email message to the respondent and Judge Rumsey's assistant requesting an emergency hearing in the termination and adoption cases. The respondent responded by stating:

> '. . . Ms. Wagle has requested emergency orders three times since last Thursday and has been denied on each occasion. Wichita Police Department has advised Ms. Wagle's client there is no emergency and they will not assist. I object to further emergency hearings between these parties.'

The respondent's response was misleading. Ms. Wagle replied in an email sent that same day to the respondent, Judge Rumsey, and his assistant correcting the respondent's email and attaching copies of Judge Roush's docket sheets and communications.

"286.    On January 9, 2019, Ms. Wagle filed an answer and counterclaim in the adoption cases. In that filing, Ms. Wagle asserted that various claims in the petitions were false or were misrepresentations by the omission of material facts. Ms. Wagle moved to dismiss the adoption petitions because the petitions were not supported by facts or law and were filed for improper purposes.

"287.    On January 10, 2019, Ms. Wagle filed a petition for sanctions and attorney's fees and requested an order for the return of the children in the termination and adoption cases. The motion was set for hearing on January 17, 2019.

"288.    On January 10, 2019, Ms. Wagle replied to the respondent's January 7, 2019, email in which the respondent refused to return the children to J.C. In the message, Ms. Wagle reiterated that J.C. intended to remain in Kansas until the issue of residential custody was settled and that because J.C. remained in Kansas, she was entitled to have residential custody.

"289. The respondent's reply to Ms. Wagle included a statement that the respondent intended to request sanctions against Ms. Wagle if J.C. continued further malicious prosecution of K.E.

"290. On January 16, 2019, in the family law case, Ms. Wagle filed a proposed parenting plan and a motion to enforce custody and parenting time.

"291. Through email to the respondent, Ms. Wagle continued to request the children be returned to the residential custody of J.C. The respondent continued to refuse to do so.

"292. On January 16, 2019, the respondent filed a notice in the family law case, objecting to J.C.'s intended move to Kentucky. In the document, the respondent asserted that K.E. timely objected to J.C.'s intended move to Kentucky through communications between J.C., the respondent, and the Wichita Police Department and the filing of a petition for abduction prevention measures. The respondent also asserted that the orders issued in the abduction prevention measures case were orders that effectuated K.E.'s objection.

"293. On January 17, 2019, Judge Rumsey entertained Ms. Wagle's emergency motion. Despite Judge Roush's clear statements to the contrary, the respondent argued that the CINC cases remained open and that Judge Roush refused to order K.E. to return the children to J.C.

"294. Following the hearing, Judge Rumsey ordered the immediate return of the children to J.C. and an immediate suspension of K.E.'s parenting time. The judge also set a review hearing to ensure that K.E. complied with the court's order. The judge granted J.C. indigency status and appointed Ms. Wagle as counsel for J.C. The judge ordered K.E. and A.E. to pay $2,500 into Ms. Wagle's trust account to be used toward attorney's fees in the adoption proceeding. The judge held Ms. Wagle's motion for fees and sanctions in abeyance. The judge indicated that he would consider the motion for fees and sanctions if it was established at an evidentiary hearing that the adoption petitions were filed to circumvent another court's order or were filed in bad faith. The judge set the matter for trial on February 14, 2019.

55

"295.     K.E. also fathered a child (B.S.) with another woman, A.S. The respondent represented K.E. regarding issues relating to B.S. On January 10, 2019, the respondent filed a verified petition for kinship adoption without relinquishment regarding B.S., Sedgwick County District Court case number 19AD11. The adoption trial regarding B.S. was consolidated with the adoption trial regarding G.E.C. and E.E., scheduled for February 14, 2019.

"296.     On February 13, 2019, the day before the trial in the adoption cases, the respondent filed a motion to continue the adoption trials. She also sent an email message to Judge Rumsey's office asking for 'additional security measures' for her clients and witnesses based on allegations that J.C. was engaged in stalking behavior and witness intimidation.

"297.     At the outset of the hearing on February 14, 2019, Judge Rumsey summarily denied the respondent's motion to continue the termination and adoption hearing without argument.

"298.     As a preliminary matter, the respondent moved to dismiss the adoption petition she filed regarding B.S. The respondent explained that she filed the adoption case because the mother, A.S., failed to file a paternity case and because A.S. would not comply with her requests to resolve outstanding issues.

"299.     Judge Rumsey explained to the respondent that paternity actions are filed to establish parentage. A.S. did not need to file a case to establish her parentage, as the mother's parentage is established at birth. A paternity action is filed to determine the parentage of the father. A.S. was not obligated to file a paternity action to establish K.E.'s legal rights as a parent of B.S.

"300.     Chan Townsley, counsel for A.S., agreed to the dismissal, requested attorney's fees, and asked whether the court would order the return of the child to A.S. The court accepted the parties' stipulation to the dismissal, took the issue of fees under advisement, and denied A.S.'s request for the return of the child because the court had no authority to enter orders once the case was dismissed.

"301.    During the hearing on the termination and adoption petitions regarding G.E.C. and E.E., the respondent asserted that J.C. was presumed unfit under K.S.A. 38-2271 because children in her custody had been adjudged CINCs on two occasions. The respondent argued that because of the presumption, J.C. had the burden to prove by clear and convincing evidence that she was fit.

"302.    Judge Rumsey explained that there was no evidence that a child in J.C.'s custody had been adjudicated as a CINC on two occasions—only that two children in J.C.'s care had been adjudicated as CINCs. As a result, the judge concluded that the presumption of unfitness did not apply and the respondent had the burden to prove, by clear and convincing evidence, that J.C. was unfit as a mother.

"303.    After questioning two witnesses, the respondent moved to dismiss the pending adoption cases. The respondent asserted that her clients, K.E. and A.E., feared retribution from J.C. and her husband should A.E. adopt the children. Ms. Wagle agreed to the dismissal and requested that her motion for sanctions and attorney's fees be granted. She indicated that she would provide the respondent and the court with a statement of her fees. The court accepted the stipulated dismissal and took the motion for sanctions and attorney's fees under advisement.

"304.    In February 2019, shortly before the hearing on the adoption petitions, J.C. re-established therapy for G.E.C. and E.E. with a therapist who saw the children beginning in 2016. During a therapy session with G.E.C., he reported significant fear that if he leaves his home, K.E. will take him and he will never see J.C. again. G.E.C. became emotional when talking about how much he missed his step-father, J.E. He became emotionally dysregulated and was taken to a crisis center.

"305.    After K.E. and the respondent learned of the incident, on March 8, 2019, the respondent wrote to the therapist. The respondent informed the therapist that K.E. objected to G.E.C. receiving treatment without K.E. present. The respondent also stated that J.C. 'currently is subject to anti-abduction orders and in the last few months has only

57

permitted [K.E.] to see his children when the children are forcibly removed from her physical custody.' *But see* [. . .] (The district court dismissed the abduction prevent case two months earlier). The respondent also asserted that G.E.C. is:

> 'an alleged victim of abuse and neglect and is at risk of abduction and harm by J.C. J.C.'s current lethality assessment, given her long-term violent history and current multi-level life risk-stressors, is pronounced and indicative of a person capable of homicide when control cannot be achieved. '

On March 11, 2019, based on the respondent's March 8, 2019, correspondence, the therapist discontinued treatment with G.E.C. and E.E.

"306.    On February 23, 2019, Ms. Wagle filed a disciplinary complaint against the respondent. On April 22, 2019, the disciplinary administrator received the respondent's written response, dated April 5, 2019. The respondent asserted that Ms. Wagle's complaint was made in bad faith and requested that the complaint be dismissed. The respondent did not, however, address the misconduct alleged in Ms. Wagle's complaint.

"307.    On March 28, 2019, the district court granted Ms. Wagle's motion for sanctions and attorney's fees. The court found that J.C. complied with the process to seek to move the children out-of-state, K.E. violated the parenting plan by refusing to return the children on December 26, 2018, the adoption petitions were filed solely to cause a delay in the family law proceedings because adoption proceedings take precedence over family law cases, the adoption petitions effectively nullified the family law court orders of custody and parenting time, the claims in the adoption petitions were not warranted by existing law, the respondent's arguments were frivolous, and while the facts put forth would potentially have some merit in a family 'move away' case, they lacked merit in an adoption case. The court assessed fees against the respondent and her co-counsel in the amount of $11,690. Because K.E. had already paid $2,500 to Ms. Wagle, the balance owing by the respondent and her co-counsel totaled $9,190. Evidence was not presented to establish that either the respondent or her co-counsel paid the $9,190 award of attorney's fees.

"308.    On April 22, 2019, the respondent filed a motion to vacate, clarify or amend and to stay enforcement of the order of attorney's fees from March 28, 2019. Initially, the respondent argued that the court lacked subject matter jurisdiction to enter the order because the adoption cases had been dismissed.

"309.    Alternatively, the respondent falsely asserted that Ms. Wagle caused the delay by stating that the children remained subject to the CINC proceedings and that '[a]s of January 7, 2019, at 10:00 AM, the parties agreed that the children were still subject to CINC jurisdiction.' Ms. Wagle did not cause delay and the parties did not agree that CINC cases remained open. On January 3, 2019, Judge Roush made it clear that the CINC cases were closed.

"310.    The respondent also argued that based on Ms. Wagle's comments, K.E. understood that the CINC cases remained pending. And because the CINC cases remained pending, K.E., through the respondent, filed the adoption petitions to prevent the issuance of 'ex parte orders and served as express evidence that he had taken every legal measure to ensure the safety and stability of his children against [J.C.]'s increasingly hostile and erratic behavior.' (emphasis omitted). Again, on January 3, 2019, Judge Roush made it clear to all parties that the CINC cases were closed. Thus, it is not reasonable that K.E. relied on statements to the contrary. The respondent and K.E. knew that the CINC cases were closed at the time the respondent filed the termination and adoption cases.

"311.    In addition to arguing that the children remained the subject of CINC cases, the respondent made additional arguments. The respondent argued that the district court's order for attorney's fees is 'evidence of continuing, pervasive violations of [the respondent]'s First Amendment Right to Petition.' She also argued that the order for attorney's fees 'was in furtherance of an enterprise by Sedgwick County partners to provide monetary reward to attorneys who initiate bad faith and harassing litigation and ethical complaints against [the respondent], [the respondent's] clients and associated counsel for the purpose of preventing her interstate business and whistleblowing cooperation with federal Health and Human Services Agency investigation.' Finally, the respondent repeated her allegations of racketeering.

"312.    That same day, on April 22, 2019, the respondent filed a motion to change judge and a motion to transfer venue in the adoption cases. In the motion to transfer venue, the respondent argued that the March 28, 2019, order for attorney's fees was vague and incomplete. She also argued that the order was issued after her allegations for racketeering which she asserted was a causal factor in the obstruction of law enforcement officers' efforts to save the life of her cousin, E.B.

"313.    On May 30, 2019, Judge Rumsey clarified that the judgment against the respondent and her firm was ordered under K.S.A. 60-211(b). The court denied the respondent's motions for change of judge and change of venue.

"314.    After the adoption cases were dismissed, the family law case, Sedgwick County District Court case number 14DM2056, resumed before Judge Roush. On June 7, 2019, Judge Roush conducted an evidentiary hearing. Ruling from the bench, the court overruled K.E.'s objection to J.C.'s move to Kentucky and imposed sanctions against the respondent and K.E.

"315.    On June 10, 2019, Judge Roush entered an order memorializing his June 7, 2019, rulings. In the written order, the judge noted that K.E. made unfounded allegations against J.C., K.E. pulled the children out of school and changed their school 'before the ink was barely dry on the Abduction Order,' and '[e]vidence of abduction was woefully unsubstantiated.' The court found that the respondent's pleadings were presented for an improper purpose and that some of the factual contentions had no evidentiary support. The court found that 'captioning the custody and move-away issues . . . as an attempted abduction was an improper purpose.'

> 'The evidence was that [J.C.] notified [K.E.] of her intent to move to Kentucky, with a certified letter that listed her home address, employment information, and proposed school for the children to attend, along with a declared intent to follow the parties' current out-of-town parenting plan which was already in place. In short, calling this letter an abduction attempt would mean that every certified letter that attempted to comply with K.S.A. 23-3222 notice would also be an abduction attempt. Such a reading has no merit.'

60

The court sanctioned the respondent by entering a judgment of $5,000 in favor of J.C. under K.S.A. 60-211.

"316.    Judge Roush also awarded J.C. $5,000 in attorney's fees against K.E. 'Justice and equity require an award of attorney's fees against [K.E.] in favor of [J.C.] in the sum of $5,000. This is due to the repeated denial of parenting time . . . . This is entirely independent of any sanctions entered by Probate Court as a result of those proceedings.'

"317.    On August 16, 2019, the respondent filed a motion for a new trial or to alter or amend. In the motion, the respondent asserted that the court permitted Ms. Wagle to 'blatantly misrepresent law and facts' and 'rewarded the behavior with sanctions.' The respondent stated that the court's mistake was understandable 'given the gravity of the mobster-like conduct of both [J.C. and Ms. Wagle] during [the] pendency of proceedings.' The respondent demanded that the court fix the mistake or own the mistake.

"318.    On August 26, 2019, the court conducted a hearing on the respondent's motion for a new trial and other pending matters. The court denied the respondent's motion and denied the respondent's request to stay enforcement finding the respondent's allegations to be unfounded.

"319.    No evidence was presented to establish that the $5,000 sanction imposed against the respondent was paid.

"*Conclusions of Law*

"320.    Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.1 (competence), KRPC 1.2(d) (scope of representation), KRPC 1.7(a)(2) (conflict of interest), KRPC 3.1 (meritorious claims and contentions), KRPC 3.2 (expediting litigation), KRPC 3.3(a)(1) (candor to the tribunal), KRPC 3.4(c) (fairness to opposing party and counsel), KRPC 3.4(f) (fairness to opposing party and counsel), KRPC 3.5(d) (impartiality and decorum of the tribunal), KRPC 3.6(a) (trial publicity), KRPC 4.1 (truthfulness in statements to others), KRPC 4.2 (communication with a person represented by counsel), KRPC 4.4(a) (respect for rights

61

of third persons), KRPC 8.2(a) (judicial and legal officials), KRPC 8.4(c) (professional misconduct involving dishonesty), KRPC 8.4(d) (professional misconduct that is prejudicial to the administration of justice), and KRPC 8.4(g) (professional misconduct that adversely reflects on fitness to practice), as detailed below.

"321.    In addition to alleging that the respondent violated the rules detailed in ¶ 320, above, in the amended formal complaint, the disciplinary administrator also alleged that the respondent violated KRPC 1.3 (diligence), KRPC 1.4 (communication), KRPC 1.5 (fees), KRPC 1.6 (confidentiality), KRPC 1.8 (conflict of interest), KRPC 1.9 (conflict of interest), KRPC 1.16 (declining or terminating representation), KRPC 3.7 (lawyer as a witness), KRPC 4.3 (unrepresented persons), KRPC 5.7 (responsibilities regarding law-related services), KRPC 6.4 (law reform activities affecting client interests), KRPC 7.1 (communications concerning a lawyer's services), KRPC 7.2 (advertising), KRPC 8.1 (cooperation), KRPC 8.5 (jurisdiction), and former Rule 207 (cooperation). At the hearing, the disciplinary administrator did not argue that the respondent violated these rules. Because the disciplinary administrator did not argue that the respondent violated those rules, the hearing panel dismisses the allegations that the respondent violated KRPC 1.3 (diligence), KRPC 1.4 (communication), KRPC 1.5 (fees), KRPC 1.6 (confidentiality), KRPC 1.8 (conflict of interest), KRPC 1.9 (conflict of interest), KRPC 1.16 (declining or terminating representation), KRPC 3.7 (lawyer as a witness), KRPC 4.3 (unrepresented persons), KRPC 5.7 (responsibilities regarding law-related services), KRPC 6.4 (law reform activities affecting client interests), KRPC 7.1 (communications concerning a lawyer's services), KRPC 7.2 (advertising), KRPC 8.1 (cooperation), KRPC 8.5 (jurisdiction), and former Rule 207 (cooperation).

"KRPC 1.1

"322.    Lawyers must provide competent representation to their clients. KRPC 1.1. 'Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.' *Id*.

"323.    The respondent failed to provide her clients competent representation in many ways. Please note that while some of the instances included below might not rise to the level of a violation of KRPC 1.1 independently, taken as a whole, it is clear that the respondent failed to provide competent representation to her clients.

"324.    In representing her clients, the respondent regularly filed notices and in the notices the respondent requested relief. A motion is a request for relief. A notice is a warning of something. The respondent's failure to file motions to seek relief on behalf of clients amounted to incompetent representation, in violation of KRPC 1.1.

"325.    In her representation of R.T., the respondent attempted to litigate how to calculate and credit the health insurance premium. The respondent was unaware of the settled law on this point. The respondent did not make a legitimate argument for not following the law or making a change in the law. The respondent provided R.T. with incompetent representation, in violation of KRPC 1.1.

"326.    In her representation of R.T., the respondent pursued a metropolitan comparison for adjusting income for child support calculation purposes. The district court concluded that a metropolitan comparison was not supported by the Kansas child support guidelines nor was it supported by Kansas case law. Further, the respondent failed to use the adjustment from the out-of-state county where R.T. resided. The respondent failed to provide R.T. with competent representation in adjusting his income for child support calculation purposes, in violation of KRPC 1.1.

"327.    The respondent filed a motion to alter or amend the judgment and for a new trial in representing R.T. The respondent asserted that prior documents the respondent drafted and filed were factual support for the motion. The respondent's reliance on documents that she drafted and filed as factual support for a motion is another example of the respondent's incompetent representation of R.T., in violation of KRPC 1.1.

"328.    The Court of Appeals dismissed R.T.'s appeal because the respondent failed to file a brief on his behalf. The respondent failed to apply the requisite thoroughness and preparation in representing R.T. before the Court of Appeals, in violation of KRPC 1.1.

"329.    The respondent filed a second notice of appeal on behalf of R.T. Despite its title, the document purported to be a writ of mandamus to the Supreme Court. The document that the respondent filed was ineffective as a notice of appeal because the respondent failed to docket the appeal with the appellate court. The document that the respondent filed was also ineffective as initiating a mandamus action. To initiate a mandamus action, the respondent would have had to file a petition with the Supreme Court in a separate action. This is another example of the respondent's incompetent representation of R.T., in violation of KRPC 1.1.

"330.    The respondent also failed to provide competent representation to K.V. In that case, the respondent drafted a power of attorney which was executed in favor of G.K. and K.K. in an attempt to avoid the jurisdiction of the Sedgwick County District Court in an impending CINC action. The respondent attempted to have an ex parte order of temporary custody set aside before the child was taken into temporary custody. The respondent's representation of K.V. complicated K.V.'s position and ultimately, contributed to K.V.'s loss of custody of her child. The respondent suggested to the court that it cease the practice of approving ex parte orders proposed by DCF because the ex parte orders are not necessary. The respondent exhibited a lack of a basic understanding of the laws applicable in CINC and PFA cases, in violation of KRPC 1.1.

"331.    The respondent filed a petition for abduction prevention measures on behalf of K.E. In the petition, the respondent was required to disclose all cases involving custody, allocation of decision-making, or parenting time. The respondent disclosed the closed CINC cases but failed to disclose an ongoing family law case that had jurisdiction over the children. The respondent provided K.E. with incompetent representation, in violation of KRPC 1.1, by failing to identify the one relevant case.

"332. On behalf of K.E., the respondent filed a petition for the termination of parental rights and step-parent adoption regarding B.S. The respondent filed the case because B.S.'s mother would not file a paternity case and would not communicate with K.E. about issues relating to the child. A.S. was not responsible for filing suit to establish K.E.'s legal rights. The respondent provided K.E. with incompetent representation by filing the termination and adoption case, in violation of KRPC 1.1.

"333. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.1 in her representation of R.T., K.V., and K.E.

"KRPC 1.2(d)

"334. KRPC 1.2(d) provides that, '[a] lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent.' According to KRPC 1.0(e), '"[f]raud" or "[f]raudulent" denotes conduct that is fraudulent under the substantive or procedural law of the applicable jurisdiction and has a purpose to deceive.' In this jurisdiction, a fraudulent act is 'anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence justly reposed, resulting in damage to another.' *Umbehr v. Board of County Commissioners of Wabaunsee County*, 252 Kan. 30, 37, 843 P.2d 176 (1992).

"335. The respondent violated KRPC 1.2(d) in her representation of K.V. By counseling her client to move N.V. out-of-county in a failed attempt to circumvent the jurisdiction of the Sedgwick County District Court, the respondent counseled her client to engage in fraud. The respondent also drafted a power of attorney in favor of G.K. and K.K. By drafting and by having G.K. and K.K. execute the power of attorney, the respondent, again, attempted to circumvent the jurisdiction of the Sedgwick County District Court. By counseling her client and by taking actions designed to circumvent the jurisdiction of the district court, the respondent counseled and assisted her client in fraudulent conduct, in violation of KRPC 1.2(d).

"336. The hearing panel concludes that the respondent violated KRPC 1.2(d).

65

"KRPC 1.7(a)(2)

"337.    The personal interests of an attorney may create a conflict of interest for current clients. KRPC 1.7 provides:

'(a)  Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

. . . .

'(2)  there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

'(b)  Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

'(1)  the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

'(2)  the representation is not prohibited by law;

'(3)  the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

'(4)  each affected client gives informed consent, confirmed in writing.'

"338.    In her representation of R.T., the respondent did not appear at a hearing scheduled before Judge Rundle. The respondent asserted that she did not feel personally safe in appearing for the hearing and, as a result, she intentionally declined to attend the hearing. The respondent's safety concerns were related to fears of being held in contempt of court for violating court orders and facing possible incarceration. The respondent's refusal to appear on behalf of her client at a scheduled hearing materially limited her representation of R.T.

"339.    Because the respondent's representation of R.T. was materially limited by the respondent's personal interest, the hearing panel must examine the applicability of KRPC 1.7(b).

66

"340.    After the respondent refused to appear on behalf of her client at a scheduled court hearing, it was not reasonable to conclude that the respondent would be able to provide diligent and competent representation to R.T. Also, there was no evidence that R.T. gave the respondent informed consent nor that such informed consent was confirmed in writing. The hearing panel concludes that KRPC 1.7(b) does not ameliorate the respondent's violation of KRPC 1.7(a)(2).

"341.    The hearing panel concludes that the respondent violated KRPC 1.7(a)(2).

"KRPC 3.1

"342.    Attorneys are prohibited from bringing or defending a proceeding unless there is a basis for doing so that is not frivolous. KRPC 3.1.

"343.    In this case, the respondent made frivolous claims in her personal family law matter and her representation of B.J., R.T., Z.W. and N.W., K.V., D.F., and K.E. While the following list is extensive, it reflects only examples of the respondent's violations of KRPC 3.1. Providing a complete recitation of the respondent's violations of KRPC 3.1 is not necessary to paint a clear picture of the extent to which the respondent violated this rule.

"344.    In her personal family law case, the respondent repeatedly falsely accused the Sedgwick County bench, bar, and other officials of engaging in collusion and racketeering. The respondent included her allegations of collusion and racketeering in letters to county officials as well as in notices and motions filed in her personal family law case and in notices and motions she filed on behalf of clients. The respondent never provided any evidence to support these allegations. Her claims were unfounded and frivolous, in violation of KRPC 3.1.

"345.    In the respondent's family law case, the respondent asserted that the statute of limitations had passed for A.G. to become a responsible parent and that the

67

district court should terminate A.G.'s standing as a parent. The respondent provided no legal authority for her claim. The respondent's argument was frivolous, in violation of KRPC 3.1.

"346.    The respondent also argued that as a single, un-remarried woman, she was being discriminated against. She claimed that had she remarried, her new husband could adopt K.G., and A.G.'s parental rights would be terminated. The respondent's argument was frivolous, in violation of KRPC 3.1.

"347.    The respondent claimed that because she was the sole legal custodian of her child, she could not be ordered by a court to disobey a doctor's recommendation regarding her child. The respondent was obligated to comply with the court's orders. The respondent's claim lacked merit and was frivolous, in violation of KRPC 3.1.

"348.    The respondent asserted that she and the district court could jointly file a cease and desist request with OJA seeking advice on how to handle a situation. The respondent claimed that the issue did not have to be filed publicly and that a panel of three judges who sat on the OJA advisory board would hear the case. OJA does not have an advisory board to hear cease and desist requests. The respondent's claim was frivolous, in violation of KRPC 3.1.

"349.    The respondent claimed that the district court fraudulently used court jurisdiction to threaten to incarcerate the respondent and A.G. to cause K.G. to become a CINC, in violation of K.S.A. 21-5603 (contributing to a child's misconduct or deprivation). The respondent never provided any evidence that the court fraudulently used its jurisdiction to attempt to incarcerate the respondent. The respondent violated court orders and the court found her in contempt for violating court orders. The respondent's claim was frivolous, in violation of KRPC 3.1.

"350.    In the federal suit filed on behalf of B.J., the respondent claimed that the defendants were a supply chain of individuals and organizations connected by a common goal to create a market for human bondage through the exploitation of the Kansas Care and Treatment of Mentally Ill Persons Act. The respondent put forth no evidence to

support her claims. The federal court concluded that the respondent's claims were merely inflammatory conclusory labels not supported by any evidence. The respondent's claims in the federal action filed on behalf of B.J. were frivolous, in violation of KRPC 3.1.

"351.    In her representation of R.T., the respondent claimed that M.S. misrepresented her wages as full-time when she worked less than full-time and, as a result, was unjustly enriched. The respondent sought $12,000 on behalf of R.T. for M.S.'s unclean hands. The district court found that M.S.'s employment remained the same for the preceding 15 years and she had the same pay rate since 2012. The court found no evidence to support the respondent's claim of unjust enrichment, concealment of income, or underemployment. The respondent's claim was frivolous, in violation of KRPC 3.1.

"352.    The respondent asserted that opposing counsel and the court owed R.T. a greater duty of care to explain the issues with candor during the time that he was a pro se litigant. The respondent provided no legal authority to support her position. Pro se litigants are entitled to no greater safeguards. *See People v. Romero*, 694 P.2d 1256 (Colo. 1985). The respondent's claim is without merit and is frivolous, in violation of KRPC 3.1.

"353.    In that same case, the respondent alleged that Judge Rundle intentionally misrepresented the law to justify a fraudulent award of attorney's fees to opposing counsel. The respondent alleged that Judge Rundle irrationally injured an innocent third party in retaliation and in an attempt to discourage the respondent's continued representation of clients in family court. Again, the respondent provided no evidence to support her claims of wrongdoing. The respondent's claims were frivolous and libelous, in violation of KRPC 3.1.

"354.    In K.E.'s case, the respondent asserted that Mr. Whalen violated K.S.A. 20-311e by filing a motion for contempt based on the respondent's failure to pay the court-ordered sanction. Then, the respondent filed a motion for sanctions against Mr. Whalen. The respondent's claim that Mr. Whalen violated K.S.A. 20-311e by filing a motion for contempt and the respondent's motion against Mr. Whalen for sanctions were frivolous claims, in violation of KRPC 3.1.

"355.  On behalf of R.T., the respondent brought suit against members of the Sedgwick County bench, other county officials, and M.S. asserting constitutional claims and a RICO claim under 42 U.S.C. § 1983, 42 U.S.C. § 1988, and 18 U.S.C. § 1962 for collusion and retaliation. The federal court dismissed the respondent's cause of action based on immunity and because the respondent failed to state plausible claims. The respondent's claims were frivolous, in violation of KRPC 3.1.

"356.  In the motion to dismiss the CINC case the respondent filed on behalf of K.V., the respondent claimed that the district attorney's office engaged in judge shopping to aid in the unconstitutional and illegal seizure of N.V. She also claimed that the court lacked subject matter jurisdiction and the institution of the CINC case violated K.V.'s constitutional rights. The respondent's claims were not supported by evidence, were frivolous, and violated KRPC 3.1.

"357.  The respondent filed a petition for abduction prevention measures on behalf of K.E. and asserted that J.C. intended to abduct G.E.C. and E.E. The petition, however, was frivolous. J.C. provided K.E. the notice required by statute when a parent intends to move out of state. The district court concluded that the respondent's claim that J.C. intended to abduct the children had no merit. The court pointed out that if J.C.'s letter, provided under K.S.A. 23-3222 evidenced intended abduction, then every time a parent complied with the statute, there would be evidence of an intent to abduct. The respondent's claim that J.C. intended to abduct the children based on the statutory notice was frivolous, in violation of KRPC 3.1.

"358.  In the abduction prevention case, Ms. Wagle repeatedly assured the respondent that J.C. would remain in Kansas until the district court ruled on the custody case, and the respondent repeatedly claimed that J.C. intended to abduct G.E.C. and E.E. by taking them to Kentucky. The respondent's repeated claims that J.C. intended to abduct the children lacked merit and were frivolous, in violation of KRPC 3.1.

"359.  In K.E.'s case, the district court ordered that the existing parenting plan remain in effect, provided J.C. stayed in Kansas. When Ms. Wagle attempted to work

70

with the respondent in transferring the children to J.C.'s care, the respondent claimed that Ms. Wagle was maliciously prosecuting K.E. The respondent's claim of malicious prosecution was frivolous, in violation of KRPC 3.1.

"360.    The respondent filed termination of parental rights and adoption cases regarding G.E.C. and E.E. In the petitions, the respondent asserted that because J.C. had two children in her physical custody adjudicated as CINCs, J.C. was presumed unfit. The respondent's claim lacked merit. For the statutory presumption to apply, a child in J.C.'s custody had to have been adjudicated a CINC on two or more prior occasions. The respondent's claim in the termination and adoption petitions lacked merit and was frivolous, in violation of KRPC 3.1.

"361.    The respondent filed a third termination of parental rights and adoption case on behalf of K.E. The case concerned B.S. The respondent filed the petition because A.S. would not file a paternity case and otherwise settle pending issues. The respondent's purpose in filing the petition for termination and adoption was not legitimate. Thus, the third petition for termination of parental rights and adoption was frivolous, in violation of KRPC 3.1.

"362.    The respondent asserted that J.C. refused to follow the existing parenting plan. The respondent's claim was false, lacked merit, and was frivolous, in violation of KRPC 3.1.

"363.    In her representation of K.E., the district court ordered the respondent and her co-counsel to pay $9,190 in attorney's fees. Thereafter, the respondent filed a motion to vacate. In the motion, the respondent argued that the award of attorney's fees was evidence of the district court's violation of her First Amendment Right to Petition. She argued that the order furthered an enterprise by Sedgwick County to provide a monetary reward to attorneys who initiate bad faith and harassing litigation and ethical complaints against the respondent. The respondent's claim was frivolous, in violation of KRPC 3.1.

"364.    After the district court ordered the respondent to pay sanctions in the cases involving K.E. and in response to an attempt to collect the judgments, the

71

respondent asserted that Ms. Wagle and J.C. had a history of fraud. The respondent's claim that Ms. Wagle and J.C. had a history of fraud was not supported by any evidence, lacked merit, was libelous, and was frivolous, in violation of KRPC 3.1.

"365.    The hearing panel concludes that the respondent repeatedly violated KRPC 3.1 in her personal family law case and in her representation of R.T., B.J., K.V., and K.E.

KRPC 3.2

"366.    An attorney violates KRPC 3.2 if she fails to make reasonable efforts to expedite litigation consistent with the interests of her client. *Id*. Comment one to KRPC 3.2 provides:

'Dilatory practices bring the administration of justice into disrepute. Delay should not be indulged merely for the convenience of the advocates, or for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose. It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.'

"367.    In the respondent's representation of R.T., after docketing an appeal with the Court of Appeals, the respondent failed to file a brief or voluntary dismissal. The respondent failed to expedite the litigation consistent with R.T.'s interests, in violation of KRPC 3.2.

"368.    The hearing panel concludes that the respondent violated KRPC 3.2 in representing R.T. before the Court of Appeals.

"KRPC 3.3(a)(1)

"369.     The foundation of the practice of law is truth. Attorneys must be honest in all they do, particularly in appearances before courts. 'A lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.' KRPC 3.3(a)(1). The respondent violated KRPC 3.3(a)(1) in many ways, including the following.

"370.     In a motion for reconsideration, the respondent falsely informed the court that A.G.'s legal standing as a parent had been suspended and that he no longer had the standing to litigate matters relating to K.G. The respondent also argued that because she was awarded sole legal custody, she was no longer under the jurisdiction of the state. The respondent's statements in the motion were false, in violation of KRPC 3.3(a)(1).

"371.     In representing K.V., the respondent falsely asserted in a motion to dismiss and in a supplemental motion that the judge who heard the PFA petition found K.V.'s allegations of abuse more likely true than not. However, the court had not made any findings regarding the PFA petition. The court had simply continued the hearing on the PFA petition until after DCF investigated claims of emotional abuse by K.V. The respondent violated KRPC 3.3(a)(1) in making the false statement of fact.

"372.     In that same motion, the respondent falsely asserted that N.V. was the subject of a guardianship when the respondent knew that was false. The respondent drafted a power of attorney in favor of G.K. and K.K. and the respondent knew that a power of attorney did not create a guardianship. In this regard, the respondent violated KRPC 3.3(a)(1).

"373.     While representing K.V. at a temporary custody hearing and in response to a question by the district court, the respondent falsely informed the court that she had handled between 20 and 40 CINC cases during her legal career. According to other information provided by the respondent, the respondent previously handled three CINC cases. Also, the respondent previously informed another judge that she was not a family

73

law attorney, rather she was experienced in chemical regulation. The respondent's statement to the court regarding her experience in handling CINC cases was false, in violation of KRPC 3.3(a)(1).

"374.    In the respondent's supplemental motion to dismiss filed on behalf of K.V., the respondent asserted that she was ready, willing, and able to provide information about N.V.'s location before the CINC action was filed and that multiple state actors refused to discuss the case with her. The respondent's statement is untrue. The district attorney's office promptly replied to the respondent's communications before and after the CINC action was filed. The respondent did not disclose that she knew the location of the child until after an ex parte order had been issued. The respondent provided false information to the court in her supplemental motion to dismiss the CINC action, in violation of KRPC 3.3(a)(1).

"375.    The respondent filed a motion for amended temporary orders on behalf of D.F. In the motion, the respondent falsely asserted that A.A. purchased training bras for T.A. and had discussions with T.A. regarding puberty without D.F.'s prior knowledge or approval. The respondent knew that those allegations were untrue well in advance of filing the motion. The district court sanctioned the respondent for including false allegations in the motion. The respondent's statement in the motion was false, in violation of KRPC 3.3(a)(1).

"376.    The respondent made false statements to the district court in the abduction prevention petition and the termination and adoption petitions filed on behalf of K.E. In the abduction prevention petitions, the respondent falsely asserted that the children had resided with K.E. and A.E. since January 2018, and that J.C. planned to abduct the children. In the termination and adoption petitions, the respondent falsely alleged that the children had resided with A.E. continuously since 2014 and that J.C. was presumed unfit under the statute. The respondent's statements in the petitions were false, in violation of KRPC 3.3(a)(1).

"377.    In her representative capacity for K.E., the respondent sent the district court an email message regarding the physical custody of G.E.C. and E.E. The respondent falsely stated that the law enforcement officers concluded that the risk of out-

74

of-state abduction was too great and the law enforcement officers declined to enforce the court's order. The law enforcement officers did not conclude that the risk of abduction was too great; rather, the officers declined to assist in transferring the children because they concluded that two court orders conflicted. The respondent's statement in the email message to the court was false, in violation of KRPC 3.3(a)(1).

"378. The respondent argued at the hearing on Ms. Wagle's emergency order that Judge Roush refused to order K.E. to return the children to J.C. That was false. Judge Roush repeatedly informed the parties that the existing parenting plan remained in place and, as long as J.C. stayed in Kansas, she was entitled to her parenting time. At that same hearing, the respondent also argued that a second CINC case remained pending. As of January 3, 2019, the respondent knew that the children were not the subject of CINC proceedings. The respondent's statements to the district court were false and in violation of KRPC 3.3(a)(1).

"379. In a motion to vacate the respondent filed on behalf of K.E., the respondent falsely asserted that Ms. Wagle caused the delay by asserting that the children remained subject to CINC jurisdiction and by falsely asserting that the parties agreed that the children remained subject to CINC jurisdiction. The respondent also falsely asserted that she filed the termination and adoption petitions in reliance on Ms. Wagle's statement that the children remained subject to CINC jurisdiction. The respondent knew, months before, that the CINC cases were closed years before. The respondent violated KRPC 3.3(a)(1) by making false statements to the court.

"380. The hearing panel concludes that the respondent repeatedly violated KRPC 3.3(a)(1) by providing false information to the court on multiple occasions.

"KRPC 3.4(c)

"381. Clearly, lawyers must comply with court orders. KRPC 3.4(c) provides the requirement in that regard: '[a] lawyer shall not . . . knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists.'

75

"382. In March 2019 and July 2019, the respondent repeatedly canceled scheduled visits between A.G. and K.G. in violation of court orders. The respondent's refusal to comply with court-ordered parenting time for A.G. violated KRPC 3.4(c).

"383. In addition, in July 2017, the respondent informed her ex-husband that absent a doctor's recommendation, she planned to refuse all communication and visitations between A.G. and K.G. The respondent violated KRPC 3.4(c) by refusing to comply with court orders.

"384. In September 2017, in her personal family law case, the respondent informed both the court and Ms. Retzlaff that she would continue to refuse to comply with the court's orders. Again, the respondent violated KRPC 3.4(c) by refusing to comply with court orders.

"385. In her representation of R.T., the respondent refused to appear in Judge Rundle's courtroom for a scheduled hearing. As a result, the hearing could not proceed. When the respondent refused to appear in court on behalf of R.T., the respondent violated KRPC 3.4(c).

"386. During her representation of K.V., after the CINC case had been filed and an ex parte order for temporary custody had been issued, the respondent informed the district attorney's office that she knew where the child was located, that the child was safe, and that the respondent would seek a federal injunction if necessary to prevent law enforcement from retrieving N.V. unlawfully. During a temporary custody hearing held before N.V. had been taken into custody, the district court ordered the respondent and her client to produce the child. The respondent refused to produce the child, arguing that the court could not order her to produce the child because she did not have custody of the child. The respondent, however, knew where the child could be found and refused to assist in transferring the physical custody of the child. When the respondent refused to comply with the court order, the respondent violated KRPC 3.4(c).

"387.    The respondent also violated the district court orders in her representation of K.E., in violation of KRPC 3.4(c). In that case, after her client's parenting time ended, the respondent refused to honor an existing court order by assisting Ms. Wagle with the transfer of the children to J.C.

"388.    The district court ordered the respondent to pay attorney's fees and sanctions in three cases. First, the district court ordered the respondent to pay Mr. Garcia $500 for attorney's fees for violating K.S.A. 60-211(b)(3). The district court also ordered the respondent to pay two sanctions in connection with her representation of K.E. The court ordered the respondent and her co-counsel to pay $9,190 in attorney's fees to J.C. in the termination and adoption petition cases. Later, in a separate case involving the same parties, the court ordered the respondent to pay a $5,000 sanction to J.C. for violating K.S.A. 60-211. The respondent did not pay the court-ordered attorney's fees and sanctions. By failing to pay the court-ordered fees and sanctions, the respondent, again, violated KRPC 3.4(c).

"389.    The hearing panel concludes that the respondent repeatedly violated court orders in representing herself in her personal family law case as well as in representing R.T., K.V., and K.E. Accordingly, the hearing panel concludes that the respondent repeatedly violated KRPC 3.4(c).

"KRPC 3.4(f)

"390.    KRPC 3.4(f) provides that '[a] lawyer shall not . . . request a person other than a client to refrain from voluntarily giving relevant information to another party' except in a limited circumstance. The limited exception requires that the person be a 'relative or an employee or other agent of a client' and that the lawyer 'reasonably believe[] that the person's interests will not be adversely affected by refraining from giving such information.' KRPC 3.4(f).

"391.    In representing D.F., the respondent directed another person, B.W., to refrain from speaking with anyone about the child. The limited exception to KRPC 3.4(f) does not apply in this case. B.W. was not a relative, an employee, or an agent of D.F. The respondent could not reasonably believe that B.W.'s interests would not be adversely

77

affected by refraining from speaking with J.A. regarding his child's treatment. The respondent's misconduct in this regard is further aggravated by her lack of authority from her client to make the demand.

"392.    The hearing panel concludes that the respondent violated KRPC 3.4(f) by directing B.W. to refrain from speaking with anyone regarding T.A.'s treatment.

"KRPC 3.5(d)

"393.    Lawyers are required to be respectful to the court. Specifically, KRPC 3.5(d) provides that '[a] lawyer shall not . . . engage in undignified or discourteous conduct degrading to a tribunal.'

"394.    The respondent engaged in disrespectful, undignified, and discourteous conduct to the Sedgwick County bench on many occasions in the representation of herself and her clients. Some examples of the respondent's violations of KRPC 3.5(d) include the following.

"395.    The respondent repeatedly falsely accused the Sedgwick County bench, bar, and other officials of engaging in collusion and racketeering. The respondent included her allegations of collusion and racketeering in letters to county officials as well as in notices and motions filed in her personal family law case. The respondent never provided any evidence to support these allegations. The respondent's false accusations were undignified, discourteous, and degrading to the court, in violation of KRPC 3.5(d).

"396.    Judge Rundle was concerned that the respondent had communicated with a represented party while she was representing R.T. As a result, Judge Rundle directed the respondent to self-report the circumstances to the disciplinary administrator. Rather than explain the circumstances which gave rise to Judge Rundle's direction to self-report her conduct, the respondent asserted that Judge Rundle's allegations were so clearly contrary to the record that the allegations had the appearance of retaliatory harassment and collusion to conceal potential misconduct by opposing counsel. The respondent's comments were undignified, discourteous, and degrading to the tribunal, in violation of KRPC 3.5(d).

"397.    In her motion to alter or amend the judgment and for a new trial filed on behalf of R.T., the respondent asserted that the district court's denial of her motion supported her allegations of a RICO conspiracy between the judges and the attorneys who vote for the judges. The respondent's allegations were undignified, discourteous, and degrading to the court, in violation of KRPC 3.5(d).

"398.    At a temporary custody hearing regarding N.V., the district court attempted to explain to the respondent how PFA cases proceed. The respondent argued with the court, talked over the court, and then stated that she would file suit in federal court unless probable cause findings supported the CINC case. Arguing with the court, talking over the court, and threatening federal litigation were undignified, discourteous, and degrading to the court, in violation of KRPC 3.5(d).

"399.    The respondent's statements and actions described above were undignified, discourteous, and degrading to the court. The hearing panel concludes that the respondent violated KRPC 3.5(d).

"KRPC 3.6(a) and KRPC 8.4(a)

"400.    To prevent prejudice to an ongoing adjudicative proceeding, a lawyer's speech may be limited.

> 'A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.'

KRPC 3.6(a). Comment 3 to KRPC 3.6(a) limits the applicability of this rule; 'the rule applies only to lawyers who are, or who have been, involved in the investigation or litigation of a case, and their associates.'

79

"401.    Also, '[i]t is professional misconduct for a lawyer to [v]iolate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another.' KRPC 8.4(a)

"402.    On behalf of her clients, Z.W. and N.W., the respondent improperly obtained medical records and the autopsy report regarding A.B. After receiving the records, the respondent improperly disseminated the records to a reporter with the Wichita Eagle. The medical reports and autopsy report had a substantial likelihood of materially prejudicing the criminal case against those suspected in A.B.'s death and the CINC action brought to protect H.D., A.B.'s sibling.

"403.    The hearing panel concludes that the respondent attempted to violate KRPC 3.6(a) through the acts of another; by providing the medical reports and autopsy report to the reporter with the Wichita Eagle.

"KRPC 4.1

"404.    Attorneys are required to be honest in dealings with third persons. 'In the course of representing a client a lawyer shall not knowingly . . . make a false statement of material fact or law to a third person.' KRPC 4.1(a).

"405.    In the course of representing Z.W. and N.W. in a CINC action regarding H.D. and after A.B.'s death, the respondent sought A.B. and H.D.'s medical records. In H.D.'s CINC case, the district court granted the respondent's request to obtain H.D.'s medical records but denied the respondent's request to obtain A.B.'s medical records. Even though Z.W. and N.W. were neither parties nor interested parties to a family law case involving A.B.'s parents, the respondent caused subpoenas to be issued and obtained medical records and the autopsy report regarding A.B., under K.S.A. 60-245a. K.S.A. 60-245a only authorizes subpoenas from parties. In the certificate of service, the respondent indicated that her clients were not parties to the action. Nonetheless, the respondent's filing was misleading. The respondent made a false statement of material fact, in violation of KRPC 4.1, when she caused subpoenas to be issued under K.S.A. 60-245a.

80

"406.    In the respondent's representation of K.E. and after the hearing on the adoption petitions, the respondent wrote to G.E.C. and E.E.'s therapist. In the letter, the respondent falsely asserted that J.C. was subject to anti-abduction orders, violated the existing parenting plan regarding K.E.'s parenting time, and allowed K.E. to see the children only when they were forcibly removed from her physical custody. Shortly after the respondent's communication, the therapist discontinued treatment with G.E.C. and E.E. The hearing panel concludes that the respondent made false statements of material fact to a third person, in violation of KRPC 4.1.

"407.    The hearing panel concludes that the respondent twice violated KRPC 4.1.

"KRPC 4.2 and KRPC 8.4(a)

"408.    In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented in the matter without authorization.

"409.    Also, '[i]t is professional misconduct for a lawyer to [v]iolate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another.' KRPC 8.4(a)

"410.    The respondent represented D.F. in a family law matter. Mr. Garcia represented J.A. in the same action. While the parties' child was on a visit with J.A., the respondent contacted A.A., J.A.'s spouse, and told her to have J.A. call the respondent or D.F. or the respondent would contact law enforcement and request a welfare check on T.A. Because J.A. was represented by counsel, it was improper for the respondent to attempt to contact J.A. through another, in violation of KRPC 4.2 and KRPC 8.4(a).

"411.    The hearing panel concludes that the respondent violated KRPC 4.2 and KRPC 8.4(a).

"412.    When a lawyer takes action on behalf of a client, the lawyer's action must have a legitimate purpose. 'In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person or use methods of obtaining evidence that violate the legal rights of such a person.' KRPC 4.4(a).

"413.    The respondent repeatedly engaged in conduct that had no substantial purpose other than to embarrass, delay, or burden a third person. The respondent also engaged in conduct that violated the rights of a third person. Some examples of the respondent's violations of KRPC 4.4(a) include the following.

"414.    The respondent repeatedly falsely accused the Sedgwick County bench, bar, and other officials of engaging in collusion and racketeering. The respondent included her allegations of collusion and racketeering in letters to county officials, notices and motions filed in her personal family law case, and notices and motions filed on behalf of clients. The respondent never provided any evidence to support these allegations. The respondent's accusations against the bench, bar, and other officials had no purpose other than to embarrass and burden those third parties, in violation of KRPC 4.4(a).

"415.    During a December 2017, hearing in her personal family law case, the respondent stated on the record that she would be filing a cease and desist order with OJA and a suit in federal court against the court, counsel, and A.G. The respondent's threat of action had no substantial purpose other than to embarrass or burden A.G., his attorney, and the judge, in violation of KRPC 4.4(a).

"416.    The respondent filed an attorney disciplinary complaint against Ms. Retzlaff. She sent a copy of the attorney disciplinary complaint to Ms. Retzlaff's law partner and the Sedgwick County sheriff. In the cover letters that accompanied the complaint against Ms. Retzlaff, the respondent falsely accused Ms. Retzlaff of fraud. The respondent's communications served no legitimate purpose and were designed to embarrass and burden Ms. Retzlaff, in violation of KRPC 4.4(a).

"417.    In representing Z.W. and N.W., the respondent sent an email message to the district court and approximately 15 others and suggested that the Sedgwick County District Attorney's office engaged in conduct that looked like fraud. The respondent's statement served no purpose other than to embarrass and burden the district attorney's office, in violation of KRPC 4.4(a).

"418.    When the respondent improperly obtained copies of A.B.'s medical records and autopsy report, the respondent used a method of obtaining evidence that violated the legal rights of Wesley Medical Center and the Sedgwick County Forensics, in violation of KRPC 4.4(a).

"419.    In her representation of Z.W. and N.W., the respondent stated in an email message sent to several attorneys that Mr. Paschal filed malicious and defamatory ethics complaints against her, made failed attempts at criminal obstruction, and had criminally suspect motivations. The respondent's statements served no purpose other than to embarrass and burden Mr. Paschal, in violation of KRPC 4.4(a).

"420.    In the respondent's motion to dismiss the CINC proceeding pending regarding N.V., the respondent reminded the district court that no one was immune from damages for fraud. The respondent stated that she intended to file a federal case seeking an injunction for the illegal seizure of N.V. as well as for common law torts. The respondent's statements served no other purpose than to embarrass and burden the court and opposing counsel, in violation of KRPC 4.4(a).

"421.    At a temporary custody hearing regarding N.V., the respondent argued with the judge and talked over the judge. The respondent then threatened that she would file an action in federal court unless there were probable cause findings supporting the court's decision. The respondent's behavior in court and threat to sue served no purpose other than to embarrass and burden the court, in violation of KRPC 4.4(a).

"422.    After K.E. retained the respondent to represent him, the respondent filed a petition for abduction prevention measures. On the eve of the evidentiary hearing in the abduction prevention case, the respondent filed petitions for the termination of J.C.'s

83

parental rights and the adoption of the children by A.E., K.E.'s spouse. The respondent filed the abduction prevention petition and the termination and adoption petitions solely to cause a delay in the family law proceedings. The respondent had no basis for filing the cases other than to embarrass and burden J.C. and to delay the family law case, in violation of KRPC 4.4(a).

"423.     The respondent also filed a termination and adoption petition regarding B.S. The respondent filed the petition because A.S. would not communicate and resolve outstanding issues. Thus, the respondent had no substantial purpose other than to embarrass and burden A.S., in violation of KRPC 4.4(a).

"424.     After the hearing on the adoption petitions, the respondent wrote to G.E.C. and E.E.'s therapist. In the letter, the respondent falsely asserted that J.C. was subject to anti-abduction orders, violated the existing parenting plan regarding K.E.'s parenting time, and allowed K.E. to see the children only when the children were forcibly removed from J.C.'s physical custody. Shortly after the respondent's communication, the therapist discontinued treatment with G.E.C. and E.E. The respondent had no substantial purpose for sending the communication other than to embarrass and burden J.C. and the therapist, in violation of KRPC 4.4(a).

"425.     The respondent filed a motion to transfer venue on behalf of K.E. In the motion, the respondent asserted that the district court entered an award of attorney's fees against her in retaliation following her allegations in federal court that the Sedgwick County bench and bar engaged in racketeering. The respondent had no substantial purpose for repeating her racketeering claims other than to embarrass and burden the court, in violation of KRPC 4.4(a).

"426.     In the respondent's motion for a new trial filed on behalf of K.E., the respondent accused Ms. Wagle of blatantly misrepresenting the law and facts. The respondent asserted that J.C. and Ms. Wagle engaged in mobster-like conduct. Finally, the respondent argued that the court must either fix the mistake or own the mistake, referencing the respondent's pending federal court action accusing members of the local

84

bench of racketeering. The respondent's statements served no purpose other than to embarrass and burden Ms. Wagle, J.C., and the court and to delay the imposition of the sanctions, in violation of KRPC 4.4(a).

"427. The hearing panel concludes that in each of these examples, the respondent's statements served no purpose other than to embarrass the court, counsel, and the opposing party, to burden the court, counsel, and opposing party, or to cause a delay in the cases, or to violate the legal rights of another. The hearing panel concludes that the respondent repeatedly violated KRPC 4.4(a).

"KRPC 8.2(a)

"428. KRPC 8.2(a) provides:

'A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge, adjudicatory officer or public legal officer, or of a candidate for election or appointment to judicial or legal office.'

KRPC 8.2(a). The respondent made false statements regarding judges on many occasions in the representation of herself and her clients. Some examples of the respondent's violations of KRPC 8.2(a) include the following.

"429. The respondent repeatedly falsely accused the Sedgwick County bench and bar and other officials of engaging in collusion and racketeering. The respondent included her allegations of collusion and racketeering in letters to county officials, notices and motions filed in her personal family law case, and notices and motions filed on behalf of her clients. The respondent's allegations were false and defamatory and in violation of KRPC 8.2(a).

"430. Similarly, in an email message to Judge Sanders and Ms. Retzlaff, the respondent falsely asserted that four district court judges had the blood of E.B. on their hands. The respondent's allegations were false statements about the integrity of the judges, in violation of KRPC 8.2(a).

85

"431.    After a disciplinary complaint was filed against the respondent, the respondent, using her firm's Facebook page, cryptically asserted that the district court was guilty of government-sponsored human trafficking. The respondent also asserted that the court profited from the enslavement of families and threatened to incarcerate the respondent, A.G., and other family members. Finally, the respondent falsely asserted that E.B. was tortured and murdered with the help of Chief Judge Fleetwood. The respondent's false statements regarding the integrity of the Sedgwick County bench, generally, and Chief Judge Fleetwood, specifically, seriously undermined and violated KRPC 8.2(a).

"432.    The respondent filed a motion requesting that Judge Rundle recuse himself from R.T.'s case. Judge Rundle denied the motion. In the respondent's affidavit to support the motion, the respondent falsely asserted that because she previously accused Sedgwick County judges and attorneys of racketeering and because a different judge found the respondent in contempt, Judge Rundle retaliated against the respondent. The respondent asserted that R.T. was victimized by the judge's misconduct. She falsely asserted that Judge Rundle intended to cause her commercial and personal disparagement. The respondent had no evidence to support her allegations and thus, knew that the allegations she made about Judge Rundle's integrity were false, in violation of KRPC 8.2(a).

"433.    After the respondent contacted a judge ex parte, Chief Judge Fleetwood called the respondent and left a voicemail message. In the message, Chief Judge Fleetwood explained that she needed to file a motion and provide notice to the opposing side to have her request considered. Based on that contact, the respondent falsely asserted that Chief Judge Fleetwood threatened to file an ethics complaint against the respondent, Chief Judge Fleetwood engaged in obstruction, and Chief Judge Fleetwood prohibited emergency orders designed to assist law enforcement in rescuing E.B. The respondent's false statements impugned Chief Judge Fleetwood's integrity, in violation of KRPC 8.2(a).

"434.    The respondent sent an email message to Judge Dewey, Judge Rundle's administrative assistant, and Mr. Whalen. In the email message, the respondent falsely accused Judge Rundle of making threats against the respondent. The respondent also falsely asserted that members of the Sedgwick County bench threatened to put the respondent in jail with her cousin's murderers. The respondent's statements were false statements concerning the integrity of judges, in violation of KRPC 8.2(a).

"435.    The respondent sent Mr. Yost a letter in his capacity as Sedgwick County Counselor. In the letter, the respondent falsely stated that Chief Judge Fleetwood continued to engage in criminal obstruction. The respondent's false statement regarding Chief Judge Fleetwood's integrity is a violation of KRPC 8.2(a).

"436.    In representing Z.W. and N.W., the respondent repeated the false accusations that Chief Judge Fleetwood obstructed justice and prohibited the issuance of emergency orders to assist law enforcement in rescuing E.B. The respondent's false statements regarding Chief Judge Fleetwood's integrity is yet another violation of KRPC 8.2(a).

"437.    The respondent made many false statements regarding the Sedgwick County bench. The hearing panel concludes that the respondent repeatedly violated KRPC 8.2(a).

"KRPC 8.4(c)

"438.    'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c).

"439.    The respondent engaged in conduct that involved dishonesty in the following circumstances.

"440.    In a letter to Mr. Yost, the respondent asserted the Sedgwick County bench was attempting to jail the respondent in retaliation for complying with a federal racketeering investigation. While the respondent made a report to federal authorities that she believed that the Sedgwick County bench and bar were conspiring in violation of the

87

federal racketeering laws, there is no evidence that the respondent complied with a federal racketeering investigation, that a federal law enforcement agency conducted an investigation based on the respondent's communication, or that members of the Sedgwick County bench retaliated against the respondent. The respondent's statement to Mr. Yost was dishonest, in violation of KRPC 8.4(c).

"441.     While the CINC case regarding N.V. was pending, the respondent posted false information on her firm's Facebook page. The respondent falsely asserted that children were being stolen by DCF from homes in places like Andover. She falsely stated that children may be seized from their homes without any warning. The respondent's false statements on her Facebook page violate KRPC 8.4(c).

"442.     After the respondent withdrew from her representation of K.V., the respondent made a second false post on her firm's Facebook page, alluding to N.V.'s CINC case. The respondent urged Sedgwick County voters to vote against Judge Smith because he and the governor appeared to be the only two people in Kansas who thought that more non-abused children should be placed in foster care. The respondent also stated that the judge had virtually no legal experience, diminished social skills, and unabashedly marketed on behalf of private organizations that fraudulently contributed to the foster care human trafficking pipeline. The respondent violated KRPC 8.4(c) by posting false information on her Facebook page.

"443.     While representing D.F., the respondent engaged in dishonest conduct when she falsely stated to Mr. Garcia that A.A. was a named defendant in a civil RICO and § 1983 action. The respondent also engaged in dishonest conduct when she purported to act with the permission of D.F. when the respondent attempted to terminate B.W.'s treatment of T.A. The respondent violated KRPC 8.4(c) when she made false statements during her representation of D.F.

"444.     In her representation of K.E., the respondent asserted in an email message to Judge Rumsey's assistant and Ms. Wagle that Ms. Wagle had requested emergency orders three times in the previous week and the court denied her request each time. The respondent's assertion was misleading. Ms. Wagle simply asked the court to

issue an order clarifying the existing order. Ms. Wagle did not seek a new, different, or emergency order. The respondent violated KRPC 8.4(c) when she made a misleading statement to Judge Rumsey's assistant and Ms. Wagle.

"445.    After the hearing on the adoption petitions, the respondent wrote to G.E.C. and E.E.'s therapist. In the letter, the respondent falsely asserted that J.C. was subject to anti-abduction orders, violated the existing parenting plan regarding K.E.'s parenting time, and allowed K.E. to see the children only when the children were forcibly removed from J.C.'s physical custody. Shortly after the respondent's communication, the therapist discontinued treatment with G.E.C. and E.E. The respondent violated KRPC 8.4(c) when she made false statements to the therapist.

"446.    Finally, during the hearing on Ms. Wagle's emergency motion, the respondent falsely stated to the court that Judge Roush had refused to order K.E. to return the children to J.C. Judge Roush ordered the respondent and her client to return the children to J.C., provided that J.C. remain in Kansas. The respondent violated KRPC 8.4(c) through her false statements to the court.

"447.    The hearing panel concludes that the respondent repeatedly violated KRPC 8.4(c).

KRPC 8.4(d)

"448.    'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d).

"449.    The respondent repeatedly engaged in conduct that was prejudicial to the administration of justice in her personal family law case as well as in cases where she represented R.T., Z.W. and N.W., K.V., and K.E. The following are representative examples of the respondent's misconduct in this regard.

89

"450.    The respondent engaged in conduct prejudicial to the administration of justice when she repeatedly unilaterally canceled court-ordered visits between K.G. and A.G. and when she informed Judge Sanders that she would not comply with his orders. The respondent violated KRPC 8.4(d) in this regard.

"451.    In communications with A.G. and his attorney, the respondent instructed A.G. on what his attorney should have advised him to do. Attempting to insert herself between her ex-husband and his attorney and provide advice about what A.G.'s attorney should have advised him to do was prejudicial to the administration of justice, in violation of KRPC 8.4(d).

"452.    The respondent engaged in conduct prejudicial to the administration of justice, in violation of KRPC 8.4(d), when she repeatedly falsely accused the Sedgwick County family court bench and bar and other officials of engaging in collusion and racketeering. The respondent included her allegations of collusion and racketeering in letters to county officials, notices and motions filed in her personal family law case, and notices and motions filed on behalf of her clients. The respondent never provided any evidence to support these allegations.

"453.    The respondent engaged in conduct prejudicial to the administration of justice in her representation of R.T. The respondent took what should have been a simple straight-forward motion to modify child support based on a change in income and, with a scorched earth approach, turned it into vitriolic litigation. M.S.'s income had remained stable since 2012. She had the same employment since before the parties were married. Despite that, the respondent made allegations of unjust enrichment without evidence. She accused counsel of fraud and she accused the court of misconduct. The respondent engaged in professional misconduct prejudicial to the administration of justice, in violation of KRPC 8.4(d).

"454.    The respondent engaged in conduct prejudicial to the administration of justice when she obtained A.B.'s medical records and autopsy report through the family law case when her clients were not parties to the case and after the district court denied the respondent's request for the same records in H.D.'s pending CINC case. The respondent violated KRPC 8.4(d).

"455. The respondent engaged in conduct prejudicial to the administration of justice and violated KRPC 8.4(d) when she refused to inform the court of the location of N.V. and when she refused to produce N.V. The respondent engaged in conduct prejudicial to the administration of justice when she drafted and assisted K.V. in executing the power of attorney, referred to the power of attorney as a guardianship case, assisted her client in moving N.V. out-of-county, and attempted to circumvent the process and avoid the jurisdiction of the court, in violation of KRPC 1.1.

"456. The respondent engaged in conduct prejudicial to the administration of justice when she filed the petitions for abduction prevention measures in a 'move-away' case. The respondent engaged in conduct prejudicial to the administration of justice when she counseled her client to refuse to return G.E.C. and E.E. to J.C.'s physical custody. The respondent engaged in conduct prejudicial to the administration of justice when she filed the petitions for termination and adoption on the eve of the hearing on the petition for abduction prevention measures. The respondent engaged in conduct prejudicial to the administration of justice when she filed the termination and adoption petition regarding B.S. to compel A.S.'s cooperation. Finally, the respondent engaged in conduct prejudicial to the administration of justice when she failed to pay the sanctions ordered by the court. The respondent violated KRPC 8.4(d) in multiple ways in her representation of K.E.

"457. The hearing panel concludes that the respondent repeatedly engaged in conduct prejudicial to the administration of justice, in violation of KRPC 8.4(d).

"KRPC 8.4(g)

"458. 'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g).

"459. The respondent engaged in conduct that adversely reflects on her fitness to practice law when she made repeated allegations that the Sedgwick County bench and bar engaged in collusion and racketeering. The respondent's conduct adversely reflects on her fitness to practice, in violation of KRPC 8.4(g).

"460.    When the respondent inappropriately obtained A.B.'s medical records and autopsy report and provided the records and report to the Wichita Eagle newspaper, she engaged in conduct that adversely reflects on her fitness to practice law, in violation of KRPC 8.4(g).

"461.    The respondent engaged in conduct that adversely reflects on her fitness to practice law when, in response to a disciplinary complaint, the respondent falsely stated that a review of the transcript of the proceedings would establish the judge's legal inexperience, not her legal inexperience. A review of the transcript establishes that the respondent did not understand the procedures related to CINC and PFA cases. The respondent's comments in her response to the disciplinary complaint adversely reflect on her fitness to practice law, in violation of KRPC 8.4(g).

"462.    After the respondent withdrew from her representation of K.V., the respondent made a post on her firm's Facebook page, alluding to N.V.'s CINC case. The respondent urged Sedgwick County voters to vote against Judge Smith because he and the governor appeared to be the only two people in Kansas who thought that more non-abused children should be placed in foster care. The respondent also stated that the judge had virtually no legal experience, diminished social skills, and unabashedly marketed on behalf of private organizations that fraudulently contributed to the foster care human trafficking pipeline. The respondent engaged in conduct that adversely reflects on her fitness to practice law by posting the statements on her firm's Facebook page, in violation of KRPC 8.4(g).

"463.    The respondent engaged in conduct that adversely reflects on her fitness to practice law, in violation of KRPC 8.4(g) when she wrote to B.W., ordered B.W. not speak to anyone regarding her treatment of T.A., and discontinued B.W.'s services without the permission of her client.

"464.    Despite Ms. Wagle's repeated assurances that J.C. would remain in Kansas until the court ruled on custody, the respondent continuously argued that J.C. was immediately moving from Kansas and, as a result, K.E. was entitled to physical custody

92

of the children. The respondent's repeated refusal to honor the district court's order that the children return to J.C.'s physical custody adversely reflects on the respondent's fitness to practice law, in violation of KRPC 8.4(g).

"465.    K.E. refused to return the children to J.C. at the end of his parenting time. At a hearing held 10 days after the children should have returned to their mother's physical custody but had not been returned, the respondent argued that K.E. was not in violation of the existing parenting plan because it had been his weekend to have parenting time. The respondent's misplaced argument that K.E. did not violate the existing parenting agreement adversely reflects on the respondent's fitness to practice law, in violation of KRPC 8.4(g).

"466.    During the time that K.E. improperly refused to return the children to J.C., the respondent agreed to permit J.C. to have four hours of supervised visitation. The respondent's conclusion that she had the authority to establish supervised visitation when the existing parenting plan required the children to be with J.C., reflects adversely on the respondent's fitness to practice law, in violation of KRPC 8.4(g).

"467.    The respondent wrote to G.E.C. and E.E.'s therapist. Without any evidence to support the allegation, the respondent falsely asserted that G.E.C. was at risk of harm by J.C. and that J.C.'s lethality assessment was pronounced and indicative of a person capable of homicide. Shortly after the therapist received the respondent's communication, the therapist discontinued treatment with the children. The respondent's intentional interference with the patient/therapist relationship adversely reflects on the respondent's fitness to practice law, in violation of KRPC 8.4(g).

"468.    The hearing panel concludes that the respondent repeatedly engaged in conduct that adversely reflects on her fitness to practice law, in violation of KRPC 8.4(g).

"Allegations that the Respondent Violated the Rules of Professional Conduct
During the Disciplinary Proceedings

"469.    The disciplinary administrator requested that the hearing panel find violations of the Kansas Rules of Professional Conduct based on email messages sent by the respondent shortly before the disciplinary hearing. While Exhibits 307 through 309

93

are relevant for purposes of factors in aggravation, the exhibits may not form the basis of a rule violation because allegations regarding this conduct were not (and, given the timing, could not have been) included in the amended formal complaint. As such, the hearing panel considered the information contained in Exhibits 307 through 309 only as it related to factors in aggravation. *See State v. Turner,* 217 Kan. 574, 538 P.2d 966 (1975) (The disciplinary administrator must clearly set out the facts in the complaint so that the respondent receives proper notice of the basic factual situation out of which the charges might result.)

"*American Bar Association
Standards for Imposing Lawyer Sanctions*

"470.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Under Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"471.    *Duty Violated.* The respondent violated duties owed to her clients to provide competent representation and to avoid conflicts of interest. The respondent violated her duty owed to the public to maintain her personal integrity. The respondent violated duties owed to the legal system to refrain from engaging in dishonest conduct, to  refrain from abusing the legal process, and to refrain from engaging in improper communications with individuals in the legal system. Finally, the respondent violated duties to the legal profession to refrain from engaging in conduct that is dishonest, is prejudicial to the administration of justice, and adversely reflects on her fitness as an attorney.

"472.    *Mental State.* The respondent knowingly and intentionally violated her duties.

"473.    *Injury.* As a result of the respondent's extensive misconduct, the respondent caused actual serious injury to her clients, the public, the legal system and the legal profession. The respondent's misconduct also led to the unnecessary expenditure of court resources, unnecessary attorney's fees, and significant delay in many proceedings.

94

The respondent's misconduct led to the dissemination of private medical records and an autopsy report to a local newspaper. The respondent's misconduct led to the imposition of sanctions against the respondent's clients, her co-counsel, and herself. Most significantly, the respondent's misconduct resulted in G.E.C. and E.E. being separated from their mother, J.C., for 23 days.

"Aggravating and Mitigating Factors

"474.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"475.    *Dishonest or Selfish Motive*. Much of the respondent's misconduct in this case involved dishonest conduct. Clearly, the respondent's misconduct was motivated by dishonesty. Accordingly, the hearing panel concludes that the respondent's dishonest motive aggravates the misconduct in this case.

"476.    *A Pattern of Misconduct*. The respondent engaged in patterns of misconduct. The respondent repeatedly denied her ex-husband visitation with their child. She repeatedly falsely asserted that the Sedgwick County bench and bar engaged in collusion and racketeering. The respondent repeatedly improperly caused the delay. The respondent repeatedly refused to assist in transferring the physical custody of children in violation of court orders. The respondent engaged in patterns of personal attacks on opposing parties, opposing counsel, and courts throughout the underlying litigation as well as during the disciplinary investigation and prosecution. The respondent's patterns of misconduct significantly aggravate the serious misconduct in this case.

"477.    *Multiple Offenses*. The respondent committed multiple rule violations. The respondent violated KRPC 1.1 (competence), KRPC 1.2(d) (scope of representation), KRPC 1.7(a)(2) (conflict of interest), KRPC 3.1 (meritorious claims and contentions), KRPC 3.2 (expediting litigation), KRPC 3.3(a)(1) (candor to the tribunal), KRPC 3.4(c) (fairness to opposing party and counsel), KRPC 3.4(f) (fairness to opposing party and counsel), KRPC 3.5(d) (impartiality and decorum of the tribunal), KRPC 3.6(a) (trial

95

publicity), KRPC 4.1 (truthfulness in statements to others), KRPC 4.2 (communication with a person represented by counsel), KRPC 4.4(a) (respect for rights of third persons), KRPC 8.2(a) (judicial and legal officials), KRPC 8.4(c) (professional misconduct involving dishonesty), KRPC 8.4(d) (professional misconduct that is prejudicial to the administration of justice), and KRPC 8.4(g) (professional misconduct that adversely reflects on fitness to practice). The respondent violated many of the rules numerous times. The number of offenses committed by the respondent significantly aggravates the respondent's misconduct.

"478.    *Refusal to Acknowledge Wrongful Nature of Conduct*. The respondent refused to acknowledge that she engaged in any misconduct or violated any of the Kansas Rules of Professional Conduct. The respondent's refusal to acknowledge the wrongful nature of her conduct is an aggravating factor.

"479.    *Vulnerability of Victim*. The respondent's clients and the opposing parties were vulnerable to the respondent's misconduct.

a.    For issues related directly to the respondent's misconduct, two courts ordered R.T. to pay sanctions. First, the district court ordered R.T. to pay $4,440 to M.S. for costs and attorney's fees. It is unclear whether R.T. paid the $4,440 sanction. Second, the Court of Appeals ordered R.T. to pay Mr. Whalen's attorney's fees in the amount of $960. The respondent provided Mr. Whalen a $960 check.

b.    It appears to the hearing panel that the respondent's misconduct exacerbated K.V.'s situation. K.V. was vulnerable to the respondent's misconduct in that regard.

c.    J.C., G.E.C., and E.E. were vulnerable to the respondent's misconduct.

d.    Based on the obstructionist approach the respondent took in representing K.E. (refusing to assist Ms. Wagle in having the children returned to J.C.), the district court ordered K.E. to pay $5,000 in attorney's fees to J.C., for denying J.C. parenting time. Thus, K.E. was also vulnerable to the respondent's misconduct.

96

"480.    *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas on April 28, 2000. At the time of the misconduct, the respondent had been practicing law for more than 15 years.

"481.    *Indifference to Making Restitution*. The Sedgwick County District Court sanctioned the respondent personally on three occasions. Neither party presented any evidence that the respondent paid the awards of attorney's fees and sanctions.

a.   The district court ordered the respondent to pay Mr. Garcia $500 for attorney's fees for violating K.S.A. 60-211(b)(3).

b.   The district court ordered the respondent to pay two sanctions in connection with her representation of K.E. First, on March 28, 2019, the court ordered the respondent and her co-counsel to pay $9,190 in attorney's fees to J.C.

c.   On June 10, 2019, the court ordered the respondent to pay J.C. $5,000 for violating K.S.A. 60-211(b). The sanction was not based on attorney's fees. The court granted J.C. a judgment against the respondent.

"482.    Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. Because the respondent did not testify nor did she call any witnesses on her behalf, evidence of mitigation was limited. However, in reaching its recommendation for discipline, the hearing panel, in this case, notes the following:

"483.    *Absence of a Prior Disciplinary Record*. The record is void of evidence that the respondent has previously been disciplined.

"484.    *Imposition of Other Penalties or Sanctions*. While other penalties (attorney's fees and sanctions) were imposed against the respondent personally as described in ¶ 481 above, the respondent has not paid those sanctions. As a result, the imposition of the other penalties will become a mitigating factor only if the respondent pays the attorney's fees and sanctions. It is important to note that the respondent provided Mr. Whalen a $960 check from her law firm for the payment of one sanction ordered against R.T. However, there was no evidence establishing the source of the funds.

97

"485.    In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.32    Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.'

'4.51    Disbarment is generally appropriate when a lawyer's course of conduct demonstrates that the lawyer does not understand the most fundamental legal doctrines or procedures, and the lawyer's conduct causes injury or potential injury to a client.'

'5.11    Disbarment is generally appropriate when . . . (b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.'

'6.11    Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.'

'6.21    Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party, or causes serious or potentially serious interference with a legal proceeding.'

"*Discussion*

"486.    When the respondent became an attorney, she took an oath. The oath required the respondent to promise not to 'delay nor deny the rights of any person through

98

malice, for lucre, or from any unworthy desire.' She also promised not to foster or promote any 'fraudulent, groundless or unjust suit.' Finally, the respondent promised that she would 'neither do, nor consent to the doing of any falsehood in court.' The respondent failed in each regard to uphold her oath. The respondent denied the rights of A.G., R.V., and J.C. She promoted numerous fraudulent, groundless, and unjust claims and suits. The respondent provided false information to courts on many occasions.

"487.    The respondent's misconduct caused actual serious harm in each case. Most significantly, the respondent prevented a mother from seeing her children for at least 23 days. The effects of the respondent's misconduct are long-lasting.

"488.    The respondent's false allegations of collusion, racketeering, and general misconduct against the Sedgwick County bench, bar, and other officials as well as her allegations of misconduct by the disciplinary administrator as evidenced by Exhibits 307 through 309, harmed the legal profession in unmeasurable ways.

"489.    It appears to the hearing panel that instead of assisting her clients in achieving outcomes that met their needs and, as described by Judge Rundle, the respondent took a scorched earth approach to the practice of law. The respondent's approach did not serve her clients or the justice system well.

"490.    The respondent's conduct during the disciplinary proceedings, as evidenced by Exhibits 307-309, establishes that she has continued her abusive litigation practices.

"491.    For the respondent's egregious and pervasive misconduct and her refusal to acknowledge the wrongful nature of her conduct, the hearing panel concludes that the respondent should no longer enjoy the privilege of a license to practice law.

"492.    The hearing panel concludes that the respondent poses a substantial threat of harm to clients and the administration of justice and recommends that the disciplinary administrator file a motion for temporary suspension under Rule 213 (2021 Kan. Sup. Ct. R. 262).

"493.   The disciplinary administrator recommended that the respondent be disbarred.

"494.   The respondent recommended that the allegations of misconduct pending against her be dismissed.

"495.   Based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be disbarred.

"496.   Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

I.   *The panel's findings of fact and conclusions of law in the final hearing report are supported by clear and convincing evidence.*

In a disciplinary proceeding, this court generally considers the evidence, the disciplinary panel's findings, and the parties' arguments to determine whether KRPC violations exist and, if they do, the appropriate discipline to impose. Attorney misconduct must be established by clear and convincing evidence. *In re Spiegel*, 315 Kan. 143, 147, 504 P.3d 1057 (2022); see Supreme Court Rule 226(a)(1)(A) (2022 Kan. S. Ct. R. at 281). Clear and convincing evidence is evidence that causes the fact-finder to believe that the truth of the facts asserted is highly probable. *In re Murphy*, 312 Kan. 203, 218, 473 P.3d 886 (2020).

A finding is considered admitted if exception is not taken. When exception is taken, the finding is typically not deemed admitted so this court must determine whether it is supported by clear and convincing evidence. *In re Hodge*, 307 Kan. 170, 209-10, 407 P.3d 613 (2017). However, Supreme Court Rule 228(h)(2)(E) (2022 Kan. S. Ct. R. at 289) provides that after exceptions are filed, "[i]f either party fails to file a brief, that party will be deemed to have admitted the findings of fact and conclusions of law in the final hearing report."

Respondent was given adequate notice of the formal complaint and of the amended complaint, to which she filed an answer. On February 3, 2022, respondent filed a timely Notice of Exception to all findings of fact and conclusions of law in the final hearing panel report. However, respondent failed to subsequently file any supporting briefs. Rule 228(h)(2)(A) provides that the party who files an exception must file an opening brief not later than 30 days after the court clerk provides the transcript to the respondent. The Clerk of the Appellate Courts mailed Johnston a copy of the transcript on April 15, 2022, along with a notice that her brief would be due on May 18, 2022. Johnston failed to file a brief by that deadline. We then issued a May 31 order that required Johnston to either file a motion for extension of the May 18 deadline, or file a motion to file a brief instanter by June 14, 2022. Johnston did neither.

Instead, on June 14, respondent filed a motion to modify the court's May 31 order, claiming authority under Supreme Court Rule 7.06 (2022 Kan. S. Ct. R. at 51) (motion for rehearing or modification in a case decided by the Supreme Court). Along with respondent's motion to modify, she requested a stay of all deadlines.

This court issued an order on June 29, 2022, denying respondent's motion under Rule 7.06. Because respondent failed to brief, failed to extend her briefing deadline, and subsequently failed in an attempt to stay all deadlines, Rule 228(h)(2)(E) controls. Under

that rule, as we stated in our order on June 29, we "deem[] Respondent to have admitted the findings of fact and conclusions of law in the final hearing report because she failed to timely file a brief."

The evidence before the panel clearly and convincingly established that the charged misconduct violated KRPC 1.1 (competence), KRPC 1.2(d) (scope of representation), KRPC 1.7(a)(2) (conflict of interest), KRPC 3.1 (meritorious claims and contentions), KRPC 3.2 (expediting litigation), KRPC 3.3(a)(1) (candor to the tribunal), KRPC 3.4(c) (fairness to opposing party and counsel), KRPC 3.4(f) (fairness to opposing party and counsel), KRPC 3.5(d) (impartiality and decorum of the tribunal), KRPC 3.6(a) (trial publicity), KRPC 4.1 (truthfulness in statements to others), KRPC 4.2 (communication with a person represented by counsel), KRPC 4.4(a) (respect for rights of third persons), KRPC 8.2(a) (judicial and legal officials), KRPC 8.4(c) (professional misconduct involving dishonesty), KRPC 8.4(d) (professional misconduct that is prejudicial to the administration of justice), and KRPC 8.4(g) (professional misconduct that adversely reflects on fitness to practice law).

II. *Respondent's pattern of serious misconduct and dishonesty warrants disbarment.*

The final issue before us is determining the appropriate discipline to impose based on respondent's misconduct. The Disciplinary Administrator and the hearing panel recommended that we disbar respondent from the practice of law. Respondent recommends that the allegations of misconduct be dismissed and that she should receive no discipline.

"We base our disciplinary decision on the facts and circumstances of the violations and the aggravating and mitigating circumstances present. *In re Johanning*, 292 Kan. 477, 490, 254 P.3d 545 (2011). And although not mandated by our rules, this

court and disciplinary panels '[h]istorically' turn to the American Bar Association Standards for Imposing Lawyer Sanctions to guide the discipline discussion. . . .

"Under that framework, we consider four factors in assessing punishment: (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the actual or potential injury resulting from the misconduct; and (4) the existence of aggravating and mitigating circumstances. ABA Standard 3.0. [Citations omitted.]" *In re Kline*, 298 Kan. 96, 213, 311 P.3d 321 (2013).

ABA Standards for Imposing Lawyer Sanctions sections 9.22 and 9.32 list aggravating and mitigating factors to be considered. Of these, the panel found that the following aggravating factors existed: (1) dishonesty or selfish motive; (2) pattern of misconduct; (3) multiple offenses; (4) refusal to acknowledge wrongful nature of conduct; (5) especially vulnerable victim; (6) substantial experience in the practice of law; and (7) indifference in making restitution. The panel also identified the following mitigating factors: (1) absence of a prior disciplinary record; and (2) imposition of other penalties or sanctions.

After carefully considering the findings, conclusions, recommendations, and the ABA Standards for Imposing Lawyer Sanctions, we find respondent's misconduct warrants the severe sanction of disbarment.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Shayla C. Johnston is disbarred from the practice of law in the state of Kansas, effective the date of this opinion, in accordance with Supreme Court Rule 225(a)(1) (2022 Kan. S. Ct. R.at 281) for violating KRPC 1.1, 1.2(d), 1.7(a)(2), 3.1, 3.2, 3.3(a)(1), 3.4(c) and (f), 3.5(d), 3.6(a), 4.1, 4.2, 4.4(a), 8.2(a), and 8.4(c), (d), and (g).

IT IS FURTHER ORDERED that the Office of Judicial Administration strike the name of Shayla C. Johnston from the roll of attorneys licensed to practice law in Kansas.

IT IS FURTHER ORDERED that respondent shall comply with Supreme Court Rule 231 (2022 Kan. S. Ct. R. at 292) (notice to clients, opposing counsel, and courts following suspension or disbarment).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to respondent and that this opinion be published in the official Kansas Reports.